**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re TREMONT SECURITIES LAW, STATE LAW AND INSURANCE LITIGATION | Master Docket No. 1:08-11117 |
| This Document Relates to:<br><br>F. DANIEL PRICKETT,<br><br>      Plaintiff,<br><br>   v.<br><br>NEW YORK LIFE INSURANCE COMPANY, NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION, TREMONT CAPITAL MANAGEMENT, INC., RYE INVESTMENT MANAGEMENT, MASSMUTUAL HOLDING LLC, MASSACHUSETTS MUTUAL LIFE INSURANCE CO., OPPENHEIMER ACQUISITION CORP., RYE SELECT BROAD MARKET PRIME FUND L.P., RYE SELECT BROAD MARKET XL FUND L.P., RYE SELECT BROAD MARKET INSURANCE PORTFOLIO, LDC,  TREMONT OPPORTUNITY FUND III, L.P., TREMONT (BERMUDA) LTD., TREMONT GROUP HOLDING, INC., and TREMONT PARTNERS, INC.,<br><br>      Defendants. | Civil Action No. 1:09-cv-03137 (TPG)<br><br>ECF CASE<br><br>JURY TRIAL DEMANDED |

<u>**AMENDED COMPLAINT**</u>

Plaintiff F. Daniel Prickett ("Plaintiff"), by and through his undersigned counsel, brings this action based upon personal knowledge as to himself and his own acts, and on information and belief as to all other matters based on the investigation conducted by and through counsel, which included the review of complaints filed by the United States

Government and the Securities and Exchange Commission (the "SEC"), news reports published in the financial press, and other available information.

## SUMMARY OF ACTION

1.      This action arises out of the $50 billion Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff") through his investment firm, Bernard L. Madoff Investment Securities LLC ("BMIS"), and others, which was facilitated by the Defendants named herein.  These Defendants knowingly, recklessly, with gross negligence, in breach of their fiduciary duties, and/or in breach of contract, caused and permitted significant portions of Plaintiff's variable universal life insurance investment, which Plaintiff entrusted to them, to be funneled to Maddoff's Ponzi scheme.

2.      On May 12, 2003, Plaintiff purchased a variable universal life insurance policy (the "Policy") from Defendant New York Life Insurance and Annuity Corporation ("New York Life").  The Policy had a face amount of $6,394,951.00 and an initial premium of $928,044.90.  Through the Policy's investment account component, New York Life offered Plaintiff an investment in the Tremont Opportunity Fund III, L.P. (the "Tremont Fund"), an investment fund offered by Defendant Tremont Group Holdings, Inc. ("Tremont Group").  In May 2004, Plaintiff's initial investment in the Tremont Fund was $426,106.82.  Plaintiff continued to invest in the Tremont Fund, and by October 2008, Plaintiff's account statement indicated a balance of $1,138,697.62 in the Tremont Fund.

3.      Defendants represented that the investment in the Tremont Fund offered by the Policy was an investment in an underlying managed portfolio of securities, and that both the Policy and the Tremont Fund were subject to multiple levels of due diligence and monitoring.  However, rather than offering and providing Plaintiff an investment in a portfolio of underlying securities, Defendants funneled approximately 22% of Plaintiff's

investment in the Tremont Fund to Madoff's Ponzi scheme, where those funds were dissipated.

4.    On December 10, 2008, Madoff informed certain senior employees at BMIS that his investment advisory business was a fraud.  Madoff stated that he was "finished," that he had "absolutely nothing," that "[i]t's all just one big lie," and that it was "basically, a giant Ponzi scheme."  Madoff communicated to the senior employees that he had for years been paying returns to certain investors out of the principal received from other, different investors.  Madoff stated that the business was insolvent, and that it had been for years.  Madoff also stated that he estimated the losses from this fraud to be approximately $50 billion.

5.    On December 11, 2008, the SEC charged Madoff and BMIS with securities fraud in connection with a multi-billion dollar Ponzi scheme that Madoff and others perpetrated on investor clients of BMIS.  Also on December 11, 2008, Madoff and BMIS were criminally charged by the United States Attorney's Office for the Southern District of New York with securities fraud.  According to the SEC's complaint and the U.S. Attorney's criminal complaint, since at least 2005, Madoff and BMIS had been conducting a Ponzi scheme through the investment advisor services of BMIS.

6.    Madoff was unable to perpetrate this fraud on his own.  Numerous funds of funds ("FOFs"), investment advisors, and affiliates, including the Defendants, facilitated Madoff's fraud.  Although Madoff's now infamous "split-strike conversion strategy" purportedly yielded unparalleled investment returns, Madoff only charged trading commissions in return, which in turn allowed Defendants and other FOFs to charge investors exorbitant fees.  Blinded by the lure of easy money, Defendants and other FOFs, and related

third parties, utterly failed to investigate and monitor Madoff's activities. Moreover, although Defendants' business dealings with Madoff and BMIS made them aware of numerous warning signals that would have given any reasonable investor serious concerns over Madoff's operations, Defendants concealed these "red flags" from Plaintiff.

7.      The warning signals that Madoff and BMIS were not legitimate operations included, among others things, the following:

a.      The lack of transparency into BMIS, including Madoff's refusal to disclose his investment strategy;

b.      BMIS's returns were abnormally smooth with very little volatility, including only five months of negative returns in the past twelve years;

c.      The inability of other funds using a "split-strike conversion" strategy (which Madoff purportedly used) to generate returns even remotely comparable to those generated by Madoff;

d.      Madoff acted as his own prime broker, while most hedge funds use large banks such as Goldman Sachs and Morgan Stanley as their prime brokers;

e.      Unlike most hedge funds, which charge investment management fees based on the performance of the fund, BMIS only generated revenue through transaction-based commission fees;

f.      Monthly account statements sent to Madoff's investors did not support the returns they reported;

g.    In 1999, one of Madoff's competitors, Harry Markopolos, sent a detailed letter to the SEC claiming that "Madoff Securities is the world's largest Ponzi Scheme";

h.    BMIS's auditor, Friegling & Horowitz, consisted of one office in Rockland County, New York, with three employees, one of whom was 78 years old and lived in Florida, and one of whom was a secretary;

i.    BMIS's comptroller was based in Bermuda, while most mainstream hedge funds have in-house comptrollers; and

j.    BMIS did not use an independent custodian to hold its securities.

8.    Defendants' extensive and prolonged business relationships with Madoff put them in a unique position to be aware of many – if not all – of these red flags. Thus, by omitting or concealing these red flags, Defendants' representations concerning their investment products were materially false and misleading.

9.    Likewise, Defendants' representations regarding their oversight, thorough manager research, careful due diligence, risk allocation, and portfolio management were false and misleading because Defendants either conducted no oversight or due diligence whatsoever or their due diligence was so egregiously reckless that they failed to uncover the blatant warning signals.

10.    Had any of the Defendants conducted a due diligence investigation of Madoff and Madoff Securities, or if conducted, a reasonable one, Plaintiff would not have purchased Defendants' investment products.

11.    On or about December 12, 2008, Defendant Tremont Holdings reported to its "clients" that it had a 14-year relationship with Madoff, and that Plaintiff, through his

investments in Tremont, had exposure to BMIS through the Rye Select Broad Market Series. Tremont Holdings reported in that communication that Plaintiff's investments in Tremont Holdings needed to be identified and that efforts would be made to recover the investments.

12.    Defendants have acted fraudulently, recklessly, negligently, in breach of fiduciary duties owed to Plaintiff, and/or in breach of contract, and have caused and/or permitted Plaintiff to purchase improper and inappropriate investments that have significantly eroded the variable account component of the Policy.

13.    Plaintiff seeks to recover damages caused by Defendants' common law fraud, negligent misrepresentation, unjust enrichment, breach of fiduciary duty, aiding and abetting the breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, and deceptive trade practices.

14.    Plaintiff also seeks to recover from Defendants Oppenheimer Acquisition Corporation ("Oppenheimer"), OppenheimerFunds, Inc. ("OppenheimerFunds"), MassMutual Holding LLC ("MassMutual Holding"), and Massachusetts Mutual Life Insurance Co. ("MassMutual").    Each of these defendants – which are members of the MassMutual Financial Group – maintained significant influence and/or control over and provided substantial assistance to the various Tremont entities that managed and operated the Tremont Fund.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the Plaintiff is a citizen of a different state from every Defendant and because the amount in controversy exceeds $75,000.  Plaintiff is informed and believes that the citizenship of any and all individual partners of those Defendants which are partnerships

and the individual members of those defendants which are limited liability companies are diverse from that of the Plaintiff.

16.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391. Substantial acts in furtherance of the alleged fraud and/or its effects have occurred within this District.  Venue is also proper pursuant to the Order of Consolidation entered March 26, 2009 in *In re Tremont Securities Law, State Law and Insurance Litigation*, Master File No.: 08 Civ. 11117 [Docket #44].

## PARTIES

17.    Plaintiff F. Daniel Prickett is an individual residing at 573 Whimbrel Road, Kiawah Island, South Carolina.

**New York Life**

18.    Defendants New York Life Insurance Company and New York Life Insurance and Annuity Corporation are corporations organized and existing under the laws of the State of Delaware with their principal place of business at 51 Madison Avenue, New York, New York 10010.  Defendant New York Life Insurance and Annuity Corporation is a wholly-owned subsidiary of New York Life Insurance Company.

**Tremont**

19.    Defendant Tremont Capital Management Inc. ("Tremont Capital"), formerly known as Tremont Advisers Inc., is a manager of a fund of hedge funds. It is a unit of Tremont Group Holdings, Inc.  Tremont Capital is located at 555 Theodore Fremd Avenue, Rye, New York 10580.

20.    Defendant Tremont (Bermuda) Ltd. ("Tremont Bermuda") is wholly-owned by Defendant Tremont Capital and is located at Tremont House, 4 Park Road, Hamilton, Bermuda.

21.     Defendant Tremont Group is an investment manager of fund-of-funds products and multi-manager portfolios.  According to its website, Tremont Group "has been at the forefront in setting the standard in the industry for fund of hedge funds investment management.  Effective investment strategies and oversight, thorough manager research, careful due diligence, advanced risk allocation and time-tested portfolio management form the cornerstones of a comprehensive platform that has been refined over a 23 year span of dedicated strides to maximize our clients' objectives."  Tremont Group is the parent of Tremont Capital and Tremont Partners Inc. and is located at 555 Theodore Fremd Avenue, Rye, New York 10580.

22.      Defendant Tremont Partners, Inc. ("Tremont Partners") is a subsidiary of Tremont Group that manages and/or serves as General Partner of several of the Tremont Group affiliated funds.  Tremont Partners is located at 555 Theodore Fremd Avenue, Rye, New York 10580.

23.     Defendant Rye Investment Management ("Rye") is the division within Tremont Group that manages, sells, and administers the firm's select manager funds – the Rye Select Funds.  Rye is located at 555 Theodore Fremd Avenue, Rye, New York 10580.

24.     Tremont Capital, Tremont Bermuda, Tremont Group, Tremont Partners, and Rye are sometimes collectively referenced herein as "Tremont."

25.     The Tremont Fund, f/k/a American Masters Opportunity Insurance Fund, L.P. is a Delaware limited partnership managed by Tremont.  The Registered Office of the Tremont Fund is located at 1013 Centre Road, Wilmington, Delaware 19805-1297.  Tremont Partners is the General Partner of the Tremont Fund.  Through the Policy, Plaintiff had an investment in the Tremont Fund.

**Rye Funds**

26.     Defendant Rye Select Broad Market Prime Fund L.P., f/k/a American Masters Broad Market Fund, L.P. ("Prime Fund") is a Delaware limited partnership organized in 1997 and managed by Rye.  Tremont Partners is the General Partner of the Prime Fund.  The Prime Fund was one of the investment funds in which the Tremont Fund was invested.  Through the Policy, Plaintiff had an investment in the Tremont Fund, which in turn had an investment in the Prime Fund.  The Prime Fund is located at 555 Theodore Fremd Avenue, Rye, New York 10580.

27.     Defendant Rye Select Broad Market XL Fund L.P., f/k/a American Masters Broad Market Prime Fund, L.P. (the "XL Fund") is a Delaware limited partnership organized in July 13, 2006 and managed by Rye.  Tremont Partners is the General Partner of the XL Fund.  The XL Fund was one of the investment funds in which the Tremont Fund was invested.  Through the Policy, Plaintiff had an investment in the Tremont Fund, which in turn had an investment in the XL Fund.  The XL Fund is located at 555 Theodore Fremd Avenue, Rye, New York 10580.

28.     Rye Select Broad Market Insurance Portfolio, LDC (the "Rye Insurance Portfolio") is a Bermuda-incorporated limited duration company managed by Tremont (Bermuda) Ltd.  The Rye Insurance Portfolio was one of the investment funds in which the Tremont Fund was invested.  Through the Policy, Plaintiff had an investment in the Tremont Fund, which in turn had an investment in the Rye Insurance Portfolio.  Rye Insurance Portfolio is located at 555 Theodore Fremd Avenue, Rye, New York 10580.

29.     The Prime Fund, the XL Fund, and the Rye Insurance Portfolio are sometimes collectively referenced herein as the "Rye Funds."

**Oppenheimer, MassMutual Holding, and Mass Mutual**

30.    Defendant Oppenheimer is the parent company of Defendant Tremont. Oppenheimer is incorporated under the laws of the state of Delaware, and its principal place of business is 2 World Financial Center, New York, New York 10281.    Defendant Oppenheimer owns more than 75 percent of, and is listed as a "control person" of, Defendant Tremont Partners on Tremont Partners' Form ADV, which was filed with the SEC. Defendant Oppenheimer jointly markets several funds with Defendant Tremont Partners, allowing Tremont Partners to use its name on several of Tremont Partners' funds.  Defendant Tremont Partners identified itself as a "wholly owned subsidiary of Tremont Group Holdings, Inc., which in turn, is owned by Oppenheimer Acquisition Corp., the parent corporation of Oppenheimer Funds, Inc., one of the nation's largest asset management companies."   Defendant Tremont Partners' privacy policy, which also was attached to the Fund's offering materials provided to the Plaintiff, states that:

> Tremont is made up of certain entities, including its investment advisory and broker-dealer subsidiaries, and in turn, is part of a larger corporate affiliation owned by the Oppenheimer Funds group and Massachusetts Mutual Life Insurance Company.  The Tremont entities and, in some cases, its ownership affiliates often work together to provide the financial products and services offered to Tremont Clients.

31.    Defendant MassMutual Holding is the parent company of Oppenheimer Acquisition Corp.   Defendant MassMutual Holding is listed as a "control person" of Defendant Tremont Partners on Tremont Partner's Form ADV, which was filed with the SEC.  MassMutual Holding's principal business address is 1295 State Street, Springfield, Massachusetts 01111.

32.    Defendant MassMutual is the parent company of MassMutual Holding, through which it owns Oppenheimer.   MassMutual is located at 1295 State Street

Springfield, Massachusetts 01111, and is the parent company of Oppenheimer. MassMutual

owns more than 75 percent of Defendant Tremont's stock, and is listed as a "control person"

of Defendant Tremont Partners' on Tremont Partners' Form ADV, which was filed with the

SEC. Defendant Tremont Partners' privacy policy, which also was attached to the Fund's

offering materials provided to Plaintiff, states that:

> Tremont is made up of certain entities, including its investment advisory and
> broker-dealer subsidiaries, and in turn, is part of a larger corporate affiliation
> owned by the Oppenheimer Funds group and Massachusetts Mutual Life
> Insurance Company. The Tremont entities and, in some cases, its ownership
> affiliates often work together to provide the financial products and services
> offered to Tremont Clients.

33.    Defendants New York Life, Tremont, Rye, Rye Funds, Oppenheimer,

MassMutual Holding, and MassMutual, are collectively referenced herein as the

"Defendants."

## PLAINTIFF'S SUBSTANTIVE ALLEGATIONS

### Plaintiff's Variable Universal Life Insurance Policy

34.    Plaintiff purchased the Policy from New York Life on May 12, 2003. The

Policy had a face amount of $6,394,951.00 and an initial premium of $928,044.90. Through

the Policy's investment account component, Defendant New York Life offered Plaintiff an

investment in the Tremont Fund, an investment fund offered by Defendant Tremont Group.

In May 2004, Plaintiff's initial investment in the Tremont Fund was $426,106.82. Plaintiff

continued to invest in the Tremont Fund, and by October 2008, Plaintiff's account statement

indicated a balance of $1,138,697.62 in the Tremont Fund.

35.    Variable universal life ("VUL") insurance is a type of life insurance, first

offered in the late 1980s, that enjoys special tax advantages under the United States Internal

Revenue Code and allows a policy holder to build a cash value that can be invested in a

choice of separate accounts, similar to mutual funds. The number and type of investment choices available is dependent on the insurer. The cash value in these policies is able to earn investment returns without incurring current income tax as long as the policy meets the definition of life insurance and the policy remains in force. The tax free investment returns can be used to pay for the costs of insurance inside the policy.

36.     The "variable" component in the name refers to a VUL policy's "Investment Account" or "Separate Account" component, which varies in value because it is invested in the financial markets. The "universal" component in the name refers to the flexibility the owner has in making premium payments. The premiums may vary in a given month up to maximums defined by the Internal Revenue Code for life insurance.

37.     Under a VUL policy, the death benefit is the face amount of the policy plus the build up of any cash value that occurs (beyond any amount being used to fund the current cost of insurance). As long as there is sufficient cash value to pay the costs of insurance in the policy, the death benefit will be paid. Additionally, tax-free policy loans to the policyholder (which would be paid off on death by the death benefit) are available from any excess cash value. VUL policies allow the policyholder a great deal of flexibility in choosing how much premium to pay for a given death benefit. To maintain a death benefit guarantee, a specified premium level must be paid every month. To keep the policy in force, typically no premium needs to be paid as long as there is enough cash value in the policy to pay that month's cost of insurance.

**The Tremont Fund**

38.     Through his Policy's Investment Account component, Plaintiff invested in the Tremont Fund. In May 2004, Plaintiff's initial investment in the Tremont Fund was

$426,106.82. Plaintiff continued to invest in the Tremont Fund, and by October 2008, Plaintiff's account statement indicated a balance of $1,138,697.62 in the Tremont Fund.

39.     The Tremont Fund, through its fund-of-funds structure, allocated roughly 22 percent of its assets to the Rye Funds, substantially all of which went to Madoff, and substantially all of which has been lost.

**Defendants Owed Plaintiff Duties of Care and Good Faith**

40.     Defendant New York Life, as Plaintiff's insurer under the Policy, owed Plaintiff fiduciary duties, including duties under the implied covenant of good faith and fair dealing and the duty not to misrepresent the appropriateness of the investments it offered through the Policy.

41.     Notwithstanding that it had the discretion to deem investments inappropriate for its policyholders and the presence of numerous red flags concerning Madoff's fraudulent scheme, New York Life endorsed the investments in the Tremont Fund and the Rye Funds as appropriate investments for policyholders. In so doing, New York Life breached its fiduciary duties to Plaintiff and failed to perform even the most rudimentary analysis of the suitability of the investment funds it offered to policyholders.

42.     Furthermore, neither New York Life, Tremont, nor any of the Defendants exercised the requisite due care that they owed to Plaintiff. Defendants concealed from Plaintiff that Tremont had abdicated its fiduciary obligations and blindly entrusted the assets in the Tremont Fund and the Rye Funds to Madoff, BMIS, and other Madoff-related entities with no oversight. At the same time, however, they received substantial fees purportedly to oversee these investments.

**Defendant New York Life Misrepresented the Policy and Breached its Duties to Plaintiff**

43.     Defendants New York Life and Tremont made numerous misrepresentations and omissions regarding the Tremont Fund's investment strategy and the alleged safeguards and services Tremont performed on behalf of its clients and/or limited partners in the Tremont Fund.  Plaintiff reasonably relied on those misrepresentations and omissions in choosing to invest in the Tremont Fund, which directly led to his losses when Defendants allowed the Tremont Fund's assets to be invested with Madoff and/or BMIS.

44.     Defendants' misrepresentations regarding Plaintiff's investment were contained in, *inter alia*, a Variable Life Insurance Policy Private Offering Memorandum (the "PPM"), an Individual Variable Life Policy (i.e., the Policy), and an American Masters Opportunity Insurance Fund, L.P. Confidential Private Placement Memorandum (the "Tremont PPM").

45.     In these offering materials, New York Life represented to Plaintiff that his investment would be placed in a "Separate Account," and within that, one or more "Subaccounts" that each constituted an investment in "shares or units" in "underlying portfolios" of "securities" managed by an "investment manager."

46.     In the PPM, New York Life described the Separate Accounts as follows:

We have established and currently maintain the Separate Account under the laws of the State of Delaware. Any realized or unrealized income, net gains or losses from the assets of the Separate Account are credited or charged to without regard to Our other income, gains or losses, including income, gains or losses from Our other separate accounts. We put assets into the Separate Account that You have allocated to the Investment Divisions for the Policy, and We may also do the same for any other variable life insurance policies We may issue.

47.     The PPM further described the Separate Account as follows:

. . . the Company established and currently maintains one or more Private Placement Variable Universal Life Separate Accounts under the laws of the state of Delaware, pursuant to resolutions of the Company's Board of Directors.

48.    New York Life further represented that Plaintiff's funds would be allocated, within the Separate Account, to one or more "Subaccounts" that would invest Plaintiff's funds in managed portfolios of securities:

> Net Premiums may be allocated among any of the available "Subaccounts" offered with this Policy.  Each Subaccount of each Separate Account invests in shares or units of a portfolio of securities managed by one or more Portfolio Managers (the "Portfolios" or "Underlying Portfolios").

49.    In the Policy, New York life similarly represented that the Subaccounts would invest Plaintiff's assets in "portfolios" of securities:

> Registered Subaccounts invest their assets in Portfolios of one or more Registered Funds.  Exempt Subaccounts invest their assets in Portfolios of one or more Exempt Funds.

50.    New York Life also stated that the Subaccounts would invest in portfolios that New York Life would "value" at a "fair value":

> The assets of the Subaccounts will be invested in shares of corresponding Portfolios.  The Portfolios will be valued at the end of the Valuation Period at a fair value.

51.    New York Life described "Exempt Subaccounts," through which New York Life offered the Tremont Fund, in similar terms as providing an investment in an "underlying portfolio" of securities:

> An Exempt Subaccount is one that invests in shares (or units) of Underlying Portfolios that are not registered under federal securities law, and these portfolios can be expected to hold illiquid investments.

52.    In that regard, the New York Life defined "Portfolio" or "Underlying Portfolio" as "each series or investment pool of a Fund that corresponds with the specific investment objective of a Subaccount."    New York Life defined "Fund" as "either a

Registered Fund or an Exempt Fund." York Life defined "Exempt Fund" as "an underlying investment account that is excepted from registration under the Investment Company Act of 1940 by Section 3(c)(1) of that Act."

53. New York Life also assured Plaintiff that "[e]ach Underlying Portfolio has a different investment objective that it tries to achieve by following its own investment strategy."

54. New York Life also made certain representations in the offering materials about its role in managing the Separate Accounts Subaccounts on behalf of its policyholders. For example, New York Life retained "the exclusive right to select the investments of the Separate Account Subaccounts."

55. In the PPM, New York life set forth its rights to make changes to the Separate Accounts:

> When permitted by law, and subject to any required notice to You and approval by regulatory authorities or You, the Company has the right to make the following changes with regard to the Separate Accounts:
>
> - Transfer the assets of any Separate Account to one or more other separate accounts;
> - Manage any Separate Account under the direction of a committee;
> - Substitute Underlying Portfolios of any Subaccount.
> - Make available additional separate accounts;
> - Restrict or eliminate any of Your voting rights or other persons who have voting rights as to any Separate Account;
> - Restrict transfers among separate accounts;
> - Combine any Separate Account with one or more other separate accounts;
> - Make additions to, deletions from, or substitutions for the Registered Funds or Exempt Funds held by any Subaccounts;
> - Merge existing Subaccounts;
> - Close existing Subaccounts to new investments;
> - Close existing Subaccounts to new investors;

- Change the investment policy of an Subaccounts;
- Register or de-register any Separate Account under the 1940 Act;
- Change the name of any Separate Account; or
- Change the amount of any minimum or maximum investments or additional investments.

56.     In the Policy, New York Life set forth a similar array of rights by which it purported to maintain the Separate Accounts:

When permitted by law, and subject to any required notice to You and approval by regulatory authorities or You, the Company has the right to make the following changes with regard to the Separate Accounts:

- Establish new Subaccounts;
- Transfer the assets of a Separate Account to one or more other Separate Accounts;
- Substitute new Subaccounts;
- Combine existing Subaccounts to new investments;
- Eliminate Subaccounts;
- Close existing Subaccounts to new investments;
- Change the investment policy of a Subaccount;
- Restrict or eliminate any of the voting rights of policy owners or other persons who have voting rights as to a Separate Account;
- Register or de-register a Separate Account under the Investment Company Act of 1940;
- Change the name of a Separate Account;
- Change the amount of any minimum/maximum investments;
- Manage a Separate Account under the direction of a committee; and
- Substitute Underlying Portfolios of any Subaccounts.

We will notify You prior to any such change in the Subaccounts.

\*        \*        \*

17

> If any change results in a material change in the Underlying Portfolios of Subaccounts to which the Account Value for this policy are allocated, We will notify You of such change. You may then make a new election under the Allocation to Subaccounts Provision.

57.    New York Life repeated its promise to notify Plaintiff of "any changes" in his "underlying portfolio" in the PPM:

> We will notify You if any change results in a material change in the Underlying Portfolios. . . . You will be given advance notice and the ability to effect a transfer prior to or at the time the material change will become effective.

58.    The Tremont PPM, which was incorporated by reference into the PPM, represented that the Tremont Fund would invest in a portfolio of securities, specifically through an "opportunistic," "multi-manager" approach that emphasized a diversified portfolio:

> The terms "opportunity" and "opportunistic" refer to a broad range of investment strategies including but not limited to: long-short equity strategies, hedging and arbitrage techniques in the equity, fixed income, and currency markets; index arbitrage; interest rate arbitrage; convertible bond and warrant hedging; merger arbitrage; statistical long/short equity strategies; pairs trading; and investment in non-U.S. securities.

59.    In the Tremont PPM, Tremont represented that the Tremont Fund would invest in a "diversified portfolio" that Tremont promised to actively manage and monitor:

- Invest in a diversified portfolio that is actively managed and monitored by and under the General Partner, which has substantial experience in the 'alternative investment' markets;

- Invest in a diversified portfolio with a minimum capital contribution.

60.    Contrary to New York Life's representations, however, a considerable portion of Plaintiff's investment in the Policy was never invested in a portfolio of securities, much less a "diversified portfolio." And, contrary to New York Life's representations, a considerable portion of Plaintiff's investment was never managed with any meaningful investment objective or policy, and never subject to the kind of oversight that would allow

New York Life to provide Plaintiff the kind of "notice" of any "material changes" in his investment.

61.     Moreover, New York Life issued periodic statements that completely misrepresented the value of Plaintiff's investment in the Tremont Fund.

**Defendant Tremont Misrepresented the Tremont Fund and Breached its Duties to Plaintiff**

### *Tremont Misrepresented the Nature of Plaintiff's Investment in the Tremont Fund*

62.     As noted in ¶¶ 58-59 above, the Tremont PPM, which was incorporated by reference into the PPM, (a) represented that the Tremont Fund would invest in a portfolio of securities, specifically through an "opportunistic," "multi-manager" approach that emphasized a diversified portfolio; and (b) represented that the Tremont Fund would invest in a "diversified portfolio" that Tremont promised would be "actively managed and monitored" by Tremont.   Moreover, Tremont issued periodic statements that completely misrepresented the value of Plaintiff's investment in the Tremont Fund.

63.     Contrary to Tremont's representations, however, a considerable portion of Plaintiff's investment in the Policy was never invested in a portfolio of securities, much less a "diversified portfolio."   And contrary to Tremont's representations, a considerable portion of Plaintiff's investment was never "actively managed and monitored" with any meaningful investment objective or policy.

### *Tremont Misrepresented its Fiduciary Undertakings*

64.     Pursuant to the Tremont PPM, the Tremont Fund's General Partner (Tremont Partners) was "responsible for managing the day-to-day administration and operation of the Partnership."   Tremont represented that it was "responsible for selecting the Partnership's Managers, allocating assets among Managers and monitoring the Partnership's investments."

However, Tremont could not have had "responsibility" for the "monitoring" it represented because if it had been done, Tremont would have discovered that 22% of the Tremont Fund, and virtually all of the Rye Funds, were not "trading" at all, but instead were simply being misappropriated.

### Tremont Falsely Claimed to Prudently Select the Tremont Fund's Investment Manager

65.    The Tremont PPM stated that, in selecting the investment advisor – which is now known to be BMIS – the Tremont Fund was guided by the following criteria:  "the quality and stability of the Manager's organization; the ability of the Partnership to make withdrawals or liquidate its investment; and the ability of each Manager to consistently and effectively apply its investment approach."  In selecting "Managers," Tremont claimed that it "collects, analyzes and evaluates information regarding the personnel, history and background, and the investment styles, strategies and performance of professional investment management firms."  Tremont further claimed that the "Partnership makes investments based on actual historical performance. . . ."

### Tremont Falsely Claimed to Perform Adequate Due Diligence

66.    Defendant Tremont's Form ADV, which was filed with the SEC and incorporated into the Fund's offering materials, stated that Tremont "relies on underlying investment advisor reports and its examination of advisor operations as primary sources of information."   Defendant Tremont's Form ADV further stated that Tremont "utilized databases, wire services, performance measurement publications and other surveys of investment results, such as newspapers, and other business journals as information sources. . . . [and had] a license to utilize the information included in the Lipper TASS database, an extensive database of hedge fund investment manager performance."

67.    Defendant Tremont's ADV further stated that "Tremont maintain[ed] a database of over 6,000 management firms to evaluate investment process, approach and investment results."  In addition, Defendant Tremont's Form ADV stated that Tremont "sources data on new investment organizations through referrals to [Tremont] by other investment managers, its clients and contacts in the financial industry."

68.    According to its website (www.tremont.com), Defendant Tremont purportedly provided its investors with "effective investment strategies and oversight, thorough manager research, careful due diligence, advanced risk allocation and time-tested portfolio management."  Defendant Tremont's website further boasted that Tremont's "research staff evaluates investment management organizations.  The staff analyzes, in detail, the philosophy, styles, strategies, investment professionals, decision-making processes and performance of the organization and the investment products offered."  Finally, the website claimed that Defendant Tremont's "research staff conducts on-site interviews at and examination of such organizations to evaluate back office operations and internal staff, among other things."

### Tremont Falsely Claimed that it Performed Ongoing Investment Monitoring

69.    According to Defendant Tremont's Form ADV, client accounts were subject both to monthly review and daily monitoring for cash flow and fund compliance.  Defendant Tremont further reported that it used "its own proprietary software programs to monitor the performance of investment managers" and that its senior officers were responsible for performing those monitoring functions.  Defendant Tremont's Form ADV further asserted that it provided detailed quarterly reports in order to keep its investors apprised of the status of their investments.

70.     According to the Tremont PPM, Defendant Tremont "ha[d] overall responsibility for implementing the investment strategy of the Partnership and has the authority to select the Managers with which the Partnership will invest."

71.     Similarly, the Tremont PPM required the General Partner to provide each limited partner with annual and quarterly reports.  Although the quarterly reports were allowed to be unaudited, the annual reports were required to be audited by an independent certified public accountant.

72.     Defendant Tremont utterly failed to perform the duties listed above, among others.  First, despite assurances that Defendant Tremont would carefully select an investment professional to whom the Tremont Fund's investment authority was delegated, it failed to select an appropriate investment manager under the criteria outlined in the offering materials.  Second, despite pledging to conduct thorough due diligence of any investment advisor and/or investment products before making investment decisions, it failed to perform any due diligence prior to investing the Tremont Fund's and virtually all of the Rye Funds' assets with Madoff and/or BMIS.  Third, despite claims that Defendant Tremont would consistently monitor the status of the Tremont Fund's investments, it failed to conduct any such monitoring activities with respect to the Tremont Fund's assets that were invested with Madoff and/or BMIS.

**Defendants Ignored the Warning Signs Concerning Madoff and BMIS**

73.     Defendants were content to collect their respective fees and, rather than jeopardize this income stream, they failed to perform the necessary due diligence required to meet their fiduciary obligations due Plaintiff.  Likewise, to the extent that New York Life

and Tremont did perform due diligence, they violated their fiduciary duties by purposefully failing to communicate material information to their investors.

74.    According to *Bloomberg News*, Tremont "sold Madoff-managed investments since 1997 under the Rye Select Broad Market name, charging 2 percent of assets."

75.    Yet, Tremont, in breach of its fiduciary duties, failed to conduct even the most rudimentary due diligence on Madoff (instead relying on Madoff's "reputation").  Tremont failed to conduct any investigation of the *bona fides* of Madoff and his operation, and/or an analysis of the trading strategies and investment returns reported by Madoff, which remained suspiciously and consistently high even during adverse market conditions.

76.    Defendant Tremont, as the manager and general partner of the Tremont Fund and the Rye Funds, utterly failed to supervise, monitor, and manage the investments of those funds.  By way of its failures and omissions, Tremont violated its duties under the laws of the State of New York.

77.    Defendant Tremont acted with knowledge that it abdicated responsibility for the management of the Tremont Fund's and the Rye Funds' assets to Madoff, and with gross negligence in failing to perform or causing to be performed appropriate due diligence that would have revealed material irregularities in the investments, operations, and financial reporting of Madoff.

78.    Defendants either knew or recklessly disregarded:  (a) the concentration of the Tremont Fund's capital in the Rye Funds; (b) the concentration of the Rye Funds' investments in a single third-party investment manager, Madoff; (c) the materially heightened risk to the Tremont Fund's and the Rye Funds' assets from such reliance on Madoff, particularly given the lack of transparency of Madoff's operations; (d) the

abnormally high and stable positive investment results reportedly obtained by Madoff; (e) the inconsistency between BMIS's publicly available financial information concerning its assets and the purported amounts that Madoff managed for clients such as Tremont; and (f) the fact that BMIS itself was audited by a small, obscure accounting firm, Friehling & Horowitz, which has its offices in Rockland County, New York and had no experience auditing entities of the apparent size and complexity of BMIS.

79.    Unlike Defendants, other investment managers and advisors who conducted due diligence on Madoff and ran even the most simplistic models testing the validity of Madoff's results, recognized the fraudulent irregularities with Madoff's investments.  For example, the financial press reported that Robert Rosenkranz of Acorn Partners, an investment advisor for high net individuals, conducted due diligence on Madoff and found it very likely that the BMIS account statements were generated as part of a fraudulent scheme. Mr. Rosenkranz reached this conclusion based on, *inter alia*, the abnormally stable and high investment returns claimed by Madoff, as well as the inconsistencies between customer account statements and the audited BMIS financial statements filed with the SEC.

80.    The financial press also reported that, prior to the disclosure of the massive fraud caused by Madoff, Simon Fludgate, head of operational due diligence at Aksia, another advisory firm, concluded that the stock holdings reported in the quarterly statements of BMIS filed with the SEC appeared too small to support the size of the assets Madoff claimed to be managing.  The likely reason for this was revealed on December 15, 2008, when investigators working at Madoff's offices determined that Madoff was operating a secret, unregistered investment vehicle from his office.

81.    Further, *BusinessWeek* reported that "managers of the Fort Worth pension fund, who first invested with Rye five years ago, started to rethink their investment in early 2008 after hiring Albourne Partners, a London due diligence firm, to assess their hedge fund portfolio.  The Rye Fund raised red flags almost immediately.  Albourne's managing director, Simon Ruddick, says the firm, which had long-standing concerns about Madoff's trading strategy and consistent returns, had urged clients for nearly a decade to avoid affiliated funds such as Rye.  In July, the pension's board voted unanimously to dump its Rye stake."

82.    Indeed, there were warning signs going back as early as 1992 that should have alerted investment professionals, such as New York Life and Tremont, that Madoff and/or BMIS were perpetrating a massive fraud on investors.

83.    For example, in 1992, the SEC filed a lawsuit against accountants Frank Avellino and Michael Bienes, who sold $441 million in unregistered securities to 3,200 people, promising returns of 13.5 to 20 percent, and invested the money entirely with Madoff.  As a result of the SEC investigation, Avellino and Bienes agreed to shut down their business and reimbursed their clients.  No action was taken against Madoff.

84.    In May 1999, Harry Markopolos, a derivative expert with experience managing the "split-strike conversion" strategy used by Madoff, sent a letter to the SEC describing how Madoff could not have generated the returns he reported using that strategy.

85.    A May 2001 article entitled "Madoff Tops Charts; Skeptics Ask How" in *MAR/Hedge*, a semi-monthly newsletter reporting on the hedge fund industry, reported that Madoff had reported positive returns for the last eleven-plus years for Fairfield Sentry and other feeder funds, but that current and former traders, other money managers, consultants,

quantitative analysts, and fund-of-funds executives, many of whom were familiar with the so-called split-strike conversion strategy used by Madoff, questioned the consistency of the returns. These professionals noted that others using the strategy had nowhere near the same degree of success, and that Gateway, a publicly traded mutual fund, which also used the strategy purported employed by Madoff, had experienced far greater volatility and lower returns than Madoff.

86.    Further, the article reported that Madoff's strategy and trading were done by signals from a proprietary "black box," and that Madoff would not disclose the specifics of his firm's risk management and how it could move so much capital in and out of positions without having a major effect on the market. The article quoted Madoff as saying "I'm not interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk."

87.    On May 27, 2001, *Barron's* published an article entitled "Don't Ask, Don't Tell; Bernie Madoff is so secretive, he even asks his investors to keep mum." As reported in *Barron's*, Madoff's accounts

> [H]ave produced compound average annual returns of 15% for more than a decade. Remarkably, some of the larger, billion-dollar Madoff-run funds have never had a down year. When *Barron's* asked Madoff how he accomplishes this, he says, 'It's a proprietary strategy. I can't go into it in great detail.' Nor were the firms that market Madoff's fund forthcoming.

88.    The article reported that some on Wall Street, including three options strategists for major investment banks, were skeptical regarding how Madoff achieved his double-digit returns using options alone, and told *Barron's* they couldn't understand how "Madoff churns out such numbers using this strategy."

89.    The article further reported that:

The lessons of Long-Term Capital Management's collapse are that investors need, or should want, transparency in their money manager's investment strategy. But Madoff's investors rave about his performance – even though they don't understand how he does it. "Even knowledgeable people can't really tell you what he's doing," one very satisfied investor told *Barron's*. People who have all the trade confirms and statement still can't define it very well; . . . This investor declined to be quoted by name. Why? Because Madoff politely requests that his investors not reveal that he runs their money.

\*       \*       \*

What Madoff told us was, 'If you invest with me, you must never tell anyone that you're invested with me.  It's no one's business what goes on here,' says an investment manager who took over a pool of assets that included an investment in a Madoff fund.  'When he couldn't explain to my satisfaction how they were up or down in a particular month,' he added, 'I pulled the money out.'

90.     Moreover, Madoff, instead of using an outside prime broker as nearly all hedge funds do, was his own prime broker and custodian of all the assets he manages.  A December 13, 2008 article in *The Wall Street Journal* quoted Chris Addy, founder of Castle Hall Alternatives, which invests in hedge funds for clients, as follows:  "There was no independent custodian involved who could prove the existence of assets. . . .  There's clear and blatant conflict of interest with a manager using a related-party broker-dealer.  Madoff is enormously unusual in that this is not a structure I've seen."

91.     On November 7, 2005, Markopolos submitted another letter to the SEC, titled "The World's Largest Hedge Fund is a Fraud," in which he set forth in detail, over 17 single-spaced pages and a two-page attachment, how Madoff's returns could not be real.  Markopolos identified 29 red flags that were signs of highly suspicious activity at Madoff Securities, including:

a.      *"Madoff does not allow outside performance audits."*  (Emphasis in original.)

b.      *"[W]hy would B[ernard] M[adoff] settle for charging only undisclosed commissions when he could earn standard hedge fund fees of 1% management fee + 20% of the profits?"*  (Emphasis in original.)

    c.     "The third party hedge funds and fund of funds that market this hedge fund strategy that invests in BM don't name and aren't allowed to name Bernie Madoff as the actual manager in their performance summaries or marketing literature. . . . ***Why the need for such secrecy?*** *If I was the world's largest hedge fund and had great returns, I'd want all the publicity I could garner and would want to appear as the world's largest hedge fund in all the industry rankings*." (Emphasis in original.)

    d.     *"It is mathematically impossible for a strategy using index call options and index put options to have such a low correlation to the market where its returns are supposedly being generated from. This makes no sense! . . . However, BM's performance numbers show only 7 extremely small* [monthly] *losses during 14 ½ years and these numbers are too good to be true. The largest one month loss was only -55 basis points (-0.55%) or just over one-half of one percent! And BM never had more than a one month losing streak!"* (Emphasis in original.)

    e.     *"Madoff's returns are not consistent with the one publicly traded option income fund with a history as long as Madoff's."* (Emphasis in original.)

    f.     *"Why is Bernie Madoff borrowing money at an average rate of 16.00% per anum and allowing these third party hedge fund, fund of funds to pocket their 1% and 20% fees bases* [sic] *upon Bernie Madoff's hard work and brains? Does this made any sense at all? Typically FOF's* [fund of funds] *charge only 1% and 10%, yet BM allows them the extra 10%. Why? And why do these third parties fail to mention Bernie Madoff in their marketing literature? After all he's the manager, don't investors have a right to know who's managing their money?"* (Emphasis in original.)

    g.     *"BM goes to 100% cash for every December 31st year-end according to one FOF invested with BM. This allows for 'cleaner financial statements' according to this source. Any unusual transfers or activity near a quarter-end or year-end is a red flag for fraud."* (Emphasis in original.)

92.    According to a January 28, 2009 article in the *New York Times*, JPMorgan Chase became concerned about its investments in BMIS in the fall of 2008 when its "due-diligence people had too many doubts." Consequently, in October 2008, JPMorgan Chase "suddenly cashed out" of the Madoff-invested Fairfield funds.

**Defendants Reveal their Fraud to Plaintiff and Other Investors**

93.    In a letter dated December 18, 2008, New York Life informed Plaintiff that it

had channeled Plaintiff's investment to Madoff's Ponzi scheme:

> New York Life Insurance and Annuity Corporation's Magnastar Private
> Placement Variable Universal Life Policy ("Magnastar") offers the Tremont
> Opportunity Fund III, L.P. and the Tremont International Fund, L.P. (the
> "Tremont Funds") as investment options.   We have confirmed that the
> Tremont Opportunity Fund III, L.P. through its fund-of-funds structure, has
> investment exposure to Madoff Investment Securities LLC.

94.    In a letter dated December 23, 2008, New York Life informed Plaintiff that

22% of his investment in the Tremont Fund had investment exposure to Madoff's scheme:

> From preliminary discussions with Tremont Capital Management ("Tremont"),
> we understand that there is exposure to Madoff in the Tremont Opportunity
> Fund III through investments in 3 funds:  Rye Select Broad Market Insurance
> Fund LP; Rye Select Broad Market Prime Fund LP; and Rye Select Broad
> Market XL Fund LP.    It appears that all three of these funds invested
> substantially all of their assets with Madoff, and that, according to Tremont, as
> of 10/31/08, the allocation to these three funds represented roughly 22% of the
> Tremont Opportunity Fund III assets.   In addition to this exposure, it is
> possible that there is further exposure to Madoff through other multi-strategy
> fund investments, but we have no knowledge of any additional exposure at this
> time.

95.    As described herein, there were numerous red flags known to Defendants prior

to and throughout the time period that Plaintiff held an interest in the Tremont Fund through

the Policy.

96.    By failing to investigate and acting in willful blindness towards these clear

signals of the illegitimate nature of BMIS, Defendants committed fraud and were grossly

negligent.

97.    The Defendants also willfully ignored the aforementioned warning signs

concerning Madoff and BMIS.

98.     If Defendants had made an appropriate inquiry concerning these warning signs, that investigation would have raised questions regarding the true value and existence of the Tremont Fund's and the Rye Funds' reported investment assets and the suitability of the Tremont Fund as an investment option to support life insurance policies.

99.      New York Life and Tremont's fraud, negligence, inadequate oversight, and abdication of their fiduciary duties have resulted in the decimation of the Investment Account component of the Plaintiff's Policy.

100.     Plaintiff now finds himself without the funds he believed he had accumulated over time.  Additionally, Plaintiff may now face unexpected and disadvantageous income tax consequences due to Defendants' actions and inactions.

**Loss Causation**

101.     Defendants' conduct, as alleged herein, proximately caused losses to Plaintiff as set forth below.

102.     First, Plaintiff has lost the portion of his principal investment in the Tremont Fund that was invested in the Rye funds.

103.     Second, Plaintiff has lost the amount he paid in taxes to federal, state, and local taxing authorities on his nonexistent earnings.  The tax statements that Defendant New York Life issued to each VUL policyholder on a yearly basis purported to reflect income earned by each respective policy holder that, in fact, did not exist.  Plaintiff relied on those statements in completing federal, state, and local tax returns.

104.     Third, Plaintiff has lost his share of the millions of dollars in management and advisory fees and administrative service fees that were paid to Defendants New York Life and Tremont.  Despite collecting those enormous fees, Defendant Tremont completely failed

to provide those services, or provided them so inadequately as to render them completely ineffective.

105.    Fourth, Plaintiff has lost the opportunity to make a different investment and to earn real returns on his investments.

**Defendants Oppenheimer, MassMutual Holding, and MassMutual Exercised Control Over Tremont**

106.    Defendants Oppenheimer, MassMutual Holding, and MassMutual – which are members of the MassMutual Financial Group – maintained significant influence and/or control over and provided substantial assistance to the Tremont entities that managed and operated the Rye Funds.

107.    MassMutual determined, in or about 2000, to accelerate its involvement in what was then the extraordinarily lucrative hedge fund arena.

108.    In search of strategic acquisitions to help it achieve this objective, MassMutual set its sights on Tremont Advisers, Tremont Group's predecessor entity. Defendant Oppenheimer was the MassMutual Financial Group entity designated to pursue a deal with Tremont Advisers.

109.    In March 2001, Oppenheimer approached Tremont Advisers' financial advisor, Putnam Lovell Securities, Inc. ("Putnam Lovell"), and expressed "an interest in exploring a strategic transaction with Tremont," according to Tremont Advisers' Form DEFM14A filed with the SEC on August 20, 2001 (the "Tremont Proxy").

110.    Tremont Advisers' access to Madoff was one of its greatest selling points. In its Form 10-K SB filled with the SEC, just as Oppenheimer was making its initial approach in March 2001, Tremont Advisers stated that the Market Fund, Prime Fund and its other proprietary investment funds were designed "to provide clients with vehicles for investments

with 'hard-to-access' managers." Plainly, Madoff was the most prominent of these "hard-to-access" managers.

111.    After Oppenheimer and Tremont Advisers entered into a confidentiality agreement on or about March 14, 2001, Oppenheimer was provided with an "information package" that Putnam Lovell had prepared. The package included, among other things, "a description of Tremont's various business lines, an overview of its investments and distribution platform, its strategic relationships, its distribution need and its financial projections," according to the Tremont Proxy.

112.    Significantly, included in this package was Putnam Lovell's "analysis of the significant contribution to Tremont's revenues from a single relationship it has with an investment manager to its proprietary investment products[,]" according to the Tremont Proxy. This "single relationship" was Tremont Advisers' critical relationship with Madoff.

113.    Thus, at the very outset of the transaction, the issue of Tremont Advisers' close and highly lucrative relationship with Madoff was placed squarely before Oppenheimer and its affiliated entities in the MassMutual Financial Group.

114.    On or about April 27, 2001, Oppenheimer submitted to Tremont Advisers a written "preliminary indication of interest" signaling that it valued Tremont Advisers at between $100 million and $140 million.

115.    Over the second half of May 2001, Oppenheimer held extensive meetings with Tremont Advisers to discuss "various business function areas, such as sales and marketing, accounting and administration and manager research," according to the Tremont Proxy.

116.    Also during the second half of May 2001, Oppenheimer representatives conducted extensive due diligence in Tremont Advisers' data room, according to the Tremont Proxy.

117.    On or about May 21, 2011, Putnam Lovell and Tremont Advisers' counsel at Skadden, Arps forwarded a draft merger agreement to Oppenheimer along with a "protocol letter" inviting Oppenheimer to submit a final proposal to acquire Tremont Advisers.

118.    From late May into early June 2001, the senior management of Tremont Advisers along with representatives of Putnam Lovell continued to work closely with senior Oppenheimer executive who were continuing their due diligence – a painstaking, deliberate process then entering its third month.

119.    The due diligence conducted by Oppenheimer focused in substantial part on Tremont Advisers' business dealings with Madoff and BMIS, as well as Madoff's investment strategy and the overall nature of BMIS's operations.

120.    By mid-June 2001, Oppenheimer had completed its due diligence, according to the Tremont Proxy.

121.    As a consequence of their due diligence and through other available sources, as early as the spring of 2001, MassMutual, MassMutual Holding, Oppenheimer, and other members of the MassMutual Financial Group were aware of (or recklessly disregarded) numerous "red flags" or indicators of gross irregularities in Madoff's operations.

122.    In addition to this due diligence, at the time Oppenheimer was pursing the purchase of Tremont Advisers, sophisticated players within the investment community who were not involved in the Tremont Advisers transaction already had begun to publicly express skepticism regarding the legitimacy of Madoff's operations.

123.    For example, in May 2001 – at the height of Oppenheimer's due diligence inquiry – the aforementioned *MAR/Hedge* article entitled "Madoff Tops Charts; Skeptics Ask How" was published.  (*See* ¶ 85, *supra*.)

124.    Noting the consistently positive returns Madoff claimed to have earned for his investors over the years, the *MAR/Hedge* article reported that numerous traders, money managers and fund managers employing a split-strike conversion strategy experienced far greater volatility and more meager returns than Madoff was reporting with respect to what he claimed was his split-strike conversion strategy. In other words, the article highlighted the fact that Madoff's track record could not be replicated by others employing the same investment strategy he claimed to be utilizing.

125.    In addition, on or about May 27, 2001 – again, at the height of Oppenheimer's due diligence inquiry – the aforementioned article entitled "Don't Ask, Don't Tell: Bernie Madoff Is So Secretive, He Even Asks His Investors to Keep Mum" was published.  (*See* ¶ 87, *supra*.)  This article reported that three derivative strategists at major investment banks were highly skeptical about the usually steady double-digit returns Madoff claimed were flowing from his split-strike conversion strategy.

126.    Additionally, a *Barron's* article quoted a former Madoff investor as stating: "Anybody who's a seasoned hedge-fund investor knows the split-strike conversion is not the whole story.  To take it at face value is a bit naïve."

127.    Notwithstanding their knowledge of Tremont Advisers' close relationship with Madoff, the nature of Madoff's operations and the skepticism that other sophisticated entities were expressing publicly with respect to Madoff's alleged investment strategy, executives at

the highest level of MassMutual, Oppenheimer, and other MassMutual Financial Group entities pressed forward with the Tremont Advisers acquisition.

128.    On or about June 8, 2011, Oppenheimer submitted a formal proposal to acquire all of Tremont Advisers' outstanding common stock for $18.25 per share, according to the Tremont Proxy.

129.    Neither its own due diligence into Madoff's operations nor the increasing skepticism being voices about his purported investment strategy dampened Oppenheimer's drive to acquire Tremont Advisers.

130.    Indeed, on or about June 25, 2001, Oppenheimer enhanced its initial proposal and offered to acquire Tremont Advisers at $19.00 per share, according to the Tremont Proxy.

131.    On June 27, 2001, Tremont Advisers' board of directors authorized senior management to conclude their negotiations with Oppenheimer.

132.    On July 9, 2001, Tremont Advisers' board unanimously approved the proposed transaction and the final terms of the deal were finalized early the next day.

**Defendants Oppenheimer, MassMutual Holding, and MassMutual Exercised Control Over Tremont's Rye Funds**

133.    Oppenheimer's acquisition of Tremont Advisers closed on October 1, 2001. From that point forward, Tremont Advisers' operations – including the marketing and investment activities of the Rye Funds – were directly under the MassMutual Financial Group umbrella.

134.    By virtue of the acquisition, Tremont Advisers became a wholly-owned direct subsidiary of Oppenheimer.

135.    In addition, Tremont Advisers' management structure was overhauled to reflect MassMutual Holding, Oppenheimer and OppenheimerFunds' deep involvement in and control over its operations.

**Defendants Oppenheimer, MassMutual Holding, and MassMutual Exercised Control Over Tremont Advisers**

136.    At the time of the acquisition of Tremont Advisers by MassMutual Financial Group, Tremont Advisers' board consisted of five members. All five board members had direct ties to a MassMutual and/or an Oppenheimer entity.

137.    Specifically, as part of the acquisition, John Murphy ("Murphy"), the chairman, chief executive officer and president of OppenheimerFunds, was named a director of Tremont Advisers.    Murphy also held the position of executive vice president at MassMutual and was a director of Oppenheimer.

138.    Joining Murphy on Tremont Advisers' restructured board of directors was Kurt Wolfgruber ("Wolfgruber").    Wolfgruber served as management director and the assistant treasurer of Oppenheimer.    Wolfgruber also served as the president, chief investment officer and director of OppenheimerFunds.

139.    In addition to Murphy and Wolfgruber, Howard E. Gunton ("Gunton"), an executive vice president and the chief financial officer of MassMutual, was named to Tremont Advisers' board. Gunton also served as a director of Oppenheimer.

140.    Further, as part of the acquisition, Sandra Manzke ("Manzke") and Robert Schulman ("Schulman"), Tremont Advisers' co-chief executive officers and board members, became employees of OppenheimerFunds, according to the Tremont Proxy.

141.    Manzke and Schulman each had employment agreements under which they would continue to serve as co-chief executives "or in other positions to which they may be

appointed from time to time" by OppenheimerFunds.  Further, those agreements provided for OppenheimerFunds to pay Manzke and Schulman annual base salaries of $500,000.00 plus potentially substantial discretionary bonuses.

142.    Subsequent to the Tremont Advisers transaction, Michael Rollings ("Rollings"), chief financial officer and an executive vice president at MassMutual, was named to Tremont Advisers' board of directors.

143.    By the time Rollings joined as a director in 2006, Tremont Advisers' board consisted of four members: Murphy, Wolfgruber, Schulman, and Rollings, according to Tremont Advisers' Annual Franchise Tax Report for 2007 filed with the State of Delaware.  As noted above, each of those four directors held senior positions with MassMutual and/or an Oppenheimer entity.

144.    By 2008, Tremont Advisers' board consisted of three members, according to Tremont's Annual Franchise Tax Report for 2008 filed with the State of Delaware.  Each of these directors – Murphy, Wolfgruber, and Rollings – was a high-level executive and/or director of an entity operating within the MassMutual Financial Group network as noted above.

145.    The remaining two members of Oppenheimer's board of directors at the time of the Tremont Advisers' acquisition were O. Leonard Darling ("Darling") and Jeremy Griffiths ("Griffiths").  Darling was chief investment officer and an executive vice president of OppenheimerFunds.

146.    Griffiths, who also served as Oppenheimer's chief financial officer and treasurer, was chief financial officer and an executive vice president of OppenheimerFunds,

according to a Form SC 13D filed by MassMutual on behalf of Tremont Advisors Inc. (now Tremont Group) dated July 20, 2001.

147.    In addition, Oppenheimer's top executives at the time of the Tremont Advisers transaction had direct ties to MassMutual and OppenheimerFunds.  Andrew J. Donohue, Oppenheimer's general counsel and secretary, was an executive vice president and the general counsel of OppenheimerFunds.

148.    Brian W. Wixted, Oppenheimer's assistant treasurer, was a senior vice president and the treasurer of OppenheimerFunds.

149.    Further, Stephen L. Kuhn, Oppenheimer's assistant secretary, was senior vice president, deputy general counsel, and assistant secretary of MassMutual.

**MassMutual Exercised Control Over MassMutual Holding**

150.    MassMutual Holding, the corporate parent of the Oppenheimer entity that acquired Tremont Advisers, also was controlled by top-level MassMutual executives at the time of the Tremont Advisers acquisition.

151.    MassMutual Holding's then chairman, president, and chief executive officer, Robert J. O'Connell, held those same positions with MassMutual simultaneously.

152.    Lawrence V. Burkett, Jr., a director and executive vice president of MassMutual Holding, served as an executive vice president and general counsel of MassMutual.

153.    Gunton, a director, vice president and the chief financial officer of MassMutual Holding, was an executive vice president and the chief financial officer of MassMutual.

154.    MassMutual Holding's director Margaret Sperry was a senior vice president and the chief compliance officer of MassMutual.

155.    In addition, Ann F. Lomeli, a director, senior vice president and the secretary of MassMutual Holding, held the titles of senior vice president, secretary, and deputy general counsel at MassMutual.

156.    Stuart H. Reese, an executive vice president of MassMutual Holding, served as the executive vice president and the chief investment officer of MassMutual.

157.    Christine Modie, an executive vice president of MassMutual Holding, was an executive vice president and the chief information officer of MassMutual.

158.    Murphy, an executive vice president with MassMutual, served as an executive vice president of MassMutual Holding.

159.    Susan A. Alfano, an executive vice president of MassMutual Holding, held that same title with MassMutual.

160.    Matthew E. Winter, a MassMutual Holding executive vice president, held the same title at MassMutual.

161.    Finally, Edward M. Kline, vice president and treasurer of MassMutual Holding, held those same positions at MassMutual.

## COUNT I

### Common Law Fraud
### (against all Defendants)

162.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

163.    Plaintiff in reasonable and justifiable reliance upon the statements and representations made by Defendants, as previously set forth herein, purchased, through the

Investment Account component of the Policy, an investment interest in the Tremont Fund, which in turn, invested in the Rye Funds. Plaintiff would not have purchased this investment interest except for his reliance upon the representations made by Defendants, and would never have purchased it had he been aware of the material omissions and concealment of the facts pertaining to these funds.

164. At the time the statements and representations were made by the Defendants, the Defendants knew them to be false, or disregarded their falsity with extreme recklessness, and Defendants intended to deceive Plaintiff by making such statements and representations and by concealing material facts.

165. Had Plaintiff known of the material facts that the Defendants wrongfully concealed and misrepresented, and the falsity of the Defendants' representations, Plaintiff would not have invested in the Tremont Fund.

166. Plaintiff, as a result of his purchase of an interest in the Tremont Fund and by reasons of the Defendants' wrongful concealments and misrepresentations, has sustained damages, suffered mental and emotional distress, and has lost a substantial part of his respective investment in an amount yet to be determined, and to be proven at trial.

167. By reason of the foregoing, Defendants are jointly and severally liable to Plaintiff.

168. Defendants' fraudulent acts were willful and wanton and Plaintiff is entitled to punitive damages.

## COUNT II

### Negligent Misrepresentation
### (against all Defendants)

169.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

170.    The Defendants owed to Plaintiff a duty:  (a) to act with reasonable care in preparing and disseminating the policy statements and other representations relied upon by Plaintiff in deciding to acquire and maintain the Policy and/or make his investment choice in the Tremont Fund; and (b) to use reasonable diligence in determining the accuracy of and preparing the information contained in those statements.  Defendants knew that these statements would be provided to policyholders and would be relied upon by them in making investment decisions concerning the Investment Account component of their VUL policies.

171.    Defendants, by their actions and inactions, knowingly, recklessly, and/or negligently issued, caused to be issued, or participated in the preparation and issuance of deceptive and materially false and misleading statements to Plaintiff regarding the nature and value of his Policy and the nature and value of his interest in the Tremont Fund.

172.    The Defendants breached their duties to Plaintiff by failing to investigate, confirm, prepare, and review with reasonable care the information contained in these statements and other representations.

173.    Neither the statements nor any other material disseminated to Plaintiff ever disclosed the risks associated with the Tremont Fund's or the Rye Funds' investment with Madoff, BMIS or other Madoff controlled entities.  As a direct, foreseeable, and proximate result of Defendants' wrongful actions and inactions, Plaintiff has sustained damages, has suffered mental and emotional distress, has lost a substantial part of his investment in an

41

amount yet to be determined, and to be proven at trial, and may find himself without life insurance coverage.

174.    By reason of the foregoing, Defendants are jointly and severally liable to Plaintiff and he is entitled to punitive damages in an amount to be determined at trial, attributable to their wanton course of conduct that was reckless, willful, and without regard to Plaintiff's rights.

## COUNT III

### Unjust Enrichment
### (against all Defendants)

175.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

176.    By their actions and inactions, Defendants have benefited and profited unjustly by receiving excessive revenue derived from the fees they collected based on the policy's cash value.

177.    These payments have been received by New York Life and Tremont at the expense of Plaintiff, under circumstances in which it would be inequitable for Defendants to be permitted to retain the benefit.

178.    Plaintiff is entitled to restitution of the excessive revenue derived from the assessment of fees based on the misrepresented cash value portion of his Policy.

## COUNT IV

**Breach of Fiduciary Duty**
**(against New York Life and Tremont)**

179.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

180.    Defendants New York Life and Tremont owed duties to Plaintiff to use due care in the investigation, recommendation, management, and supervision of the invested assets of Plaintiff.

181.    Defendants New York Life and Tremont breached their fiduciary duties to the Plaintiff by investing the assets of Plaintiff in the Rye Funds and BMIS despite numerous red flags.

182.    Defendants New York Life and Tremont breached their fiduciary duties to the Plaintiff by failing to ensure that investments offered in the Investment Account component of his Policy were appropriate, and by failing to exercise due care and reasonable oversight of those investments.

183.    Defendants New York Life and Tremont breached their fiduciary duties by investing the assets of Plaintiff in the Rye Funds, which used a single undisclosed investment advisor.

184.    Defendants New York Life and Tremont breached their fiduciary duties by allowing Plaintiff to direct his investment to funds that invested with Madoff or Madoff-related entities without any oversight, supervision, or due diligence, by failing to adequately monitor Madoff's financial reporting, and by failing to detect, prevent, or stop the misstatements and omissions of material fact alleged herein.

185.    As a proximate result of New York Life's and Tremont's breaches of fiduciary duty, Plaintiff has sustained damages, suffered mental and emotional distress, and has lost a substantial part of his investment in an amount yet to be determined and to be proven at trial.

186.    New York Life and Tremont are further liable to Plaintiff for punitive damages, in an amount also to be determined at trial, attributable to the wanton course of conduct of New York Life and Tremont that was reckless, willful and without regard to Plaintiff's rights.

187.    By reason of the foregoing, Defendants New York Life and Tremont are liable to Plaintiff.

## COUNT V

### Aiding and Abetting Fraud and Breaches of Fiduciary Duty
### (Against Tremont, Oppenheimer, and MassMutual)

188.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

189.    Defendants Tremont, Oppenheimer, and MassMutual had actual knowledge of the fiduciary duty breaches by the Tremont Fund, Rye, and the Rye Funds and substantially assisted in those breaches.

190.    Defendants Tremont, Oppenheimer, and MassMutual participated in and/or were aware of the Tremont Fund's, Rye's, and the Rye Fund's operations, and/or had intimate knowledge of their products, sales, accounting, plans and implementation thereof, had the power to influence and control and did influence and control, directly or indirectly, the decision-making of these entities, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.    Defendants Tremont,

44

Oppenheimer, and MassMutual had the ability to prevent the issuance of the false and misleading statements or cause those statements to be corrected.

191.    Defendants Tremont, Oppenheimer, and MassMutual had direct and supervisory involvement in the day-to-day operations of the Tremont Fund, Rye, and the Rye Funds and, given the size, scope, and pervasiveness of the wrongdoing and the misrepresentations alleged above, are presumed to have had the power to control or influence the particular statements giving rise to the claims alleged herein.

192.    Plaintiff suffered damages proximately caused by Tremont, Oppenheimer, and MassMutual having aiding and abetting the breaches of fiduciary duty by the Tremont Fund, Rye, and the Rye Funds in an amount to be proven at trial.

## COUNT VI

### Breach of Contract
### (against New York Life)

193.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

194.    The Policy and offering materials related thereto constitute a contract between New York Life and Plaintiff (the "Contract").

195.    Plaintiff has performed all of his obligations under the Contract.

196.    New York Life has failed and refused to perform its obligations under the Contract, including, but not limited to, the obligations to:

a.    Perform due diligence prior to adding a fund to the list of approved "Exempt Funds" in which policyholders like Plaintiff are permitted to invest their excess insurance premiums to ensure that the fund represents a true investment vehicle and not a sham;

    b.     Monitor the fund in which Plaintiff chose to invest (here, the Tremont Fund) such that New York Life could notify Plaintiff of any material change in the fund;

    c.     Make available to policyholders like Plaintiff only funds that adhere to a specific investment philosophy or philosophies and are not shams; and

    d.     Reasonably exercise its "sole discretion" to close any Investment Division that invests in funds (such as Tremont) that are illegitimate or otherwise misappropriating policyholders' funds.

197.    As a result of New York Life's breaches of the Contract, Plaintiff has sustained substantial damages.

198.    Had New York Life performed its contractual obligation to monitor the activities of Tremont and the funds in which Tremont invested, it would have (i) determined that Tremont was blindly allocating 22% of its investors' money to a Ponzi scheme that adhered to no investment philosophy whatsoever; and (ii) exercised its "sole discretion" to remove the Tremont Fund from the list of funds in which policyholders like Plaintiff could choose to invest.

## COUNT VII

**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(against New York Life)**

199.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

200.    Plaintiff entered into the Contract with New York Life. Implicit in the Contract was a duty of good faith and fair dealing.

201.    In violation of that duty, New York Life acted in a manner that destroyed or injured the right of the Plaintiff to receive the fruits of the Contract.

202.    As a direct and proximate result of New York Life's breach of that duty, Plaintiff sustained damages.

## COUNT VIII

### Violations of New York General Business Law § 349
### (against New York Life and Tremont)

203.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

204.    Defendants New York Life's and Tremont's acts and conduct, as detailed herein, constitute deceptive acts and practices in the conduct of business or in the furnishing of a service, within the meaning of § 349 of the New York General Business Law and, as such, are unlawful.

205.    Upon information and belief, the same acts and conduct used by Defendants New York Life and Tremont to defraud Plaintiff have been used repeatedly and are of a recurring nature.

206.    The acts and conduct of Defendants, by which they knowingly and fraudulently misrepresented to potential purchasers the nature of the investments that Defendants New York Life and Tremont were selling to Plaintiff, affect the public interest.

207.    As a result of Defendants New York Life and Tremont's unlawful acts and conduct in violation of § 349 of the New York General Business Law, Plaintiff has been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

47

A.    Awarding compensatory damages in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.    Awarding prejudgment interest;

C.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law (including but not limited to disgorgement);

D.    Awarding punitive damages against Defendants in an amount to be proven at trial;

E.    Awarding Plaintiff his reasonable costs and expenses incurred in this suit, including reasonable attorneys' fees, accountants' fees, and experts' fees; and

F.    Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiff hereby demands a trial by jury of all issues so triable.

Dated:  December 19, 2011                    Respectfully submitted,


                                        */s/ William S. Norton*
                                        William S. Norton (WN-4551)
                                        MOTELY RICE LLC
                                        28 Bridgeside Boulevard
                                        Mt. Pleasant, SC  29464
                                        Telephone:    843.216.9000
                                        Facsimile:    843.216.9450

                                        William H. Narwold (WN-1713)
                                        MOTLEY RICE LLC
                                        One Corporate Center
                                        20 Church Street, 17th Floor
                                        Hartford, CT  06103

48

Telephone:    860.882.1676
Facsimile:    860.882.1682

*Attorneys for Plaintiff F. Daniel Prickett*