UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------x
                                     :
F. DANIEL PRICKETT,                  :
                                     :
                  PLAINTIFF,         :        09 Civ. 3137
                                     :
            v.                       :        **OPINION**
                                     :
NEW YORK LIFE INSURANCE              :
COMPANY, ET AL.,                     :
                                     :
                  DEFENDANTS         :
                                     :
-------------------------------------x
```

       This case arises out of the Ponzi scheme perpetrated by Bernard L. Madoff and Bernard L. Madoff Investment Securities.  Plaintiff F. Daniel Prickett is a holder of a variable universal life insurance policy issued by New York Life Insurance Company.  The policy allowed plaintiff to select various tax free investments for New York Life to make on his behalf in certain "Separate Accounts" set up under the policy.  At Prickett's request, New York Life invested some of his premiums in the Tremont Fund, a hedge "fund of funds" operated by Tremont Partners, which subsequently invested 22% of its assets in three other hedge funds (the "Rye Funds") also operated by Tremont Partners.  The Rye Funds invested with Madoff.  A portion of Prickett's premiums which were invested in the Tremont Fund was lost when Madoff's Ponzi scheme became public.

Prickett brings this diversity action alleging eight state law claims. Defendants move to dismiss for failure to state a claim.

The motion is granted without leave to re-plead, except that Count 2 may be restated in accordance with directions in this opinion.

## THE COMPLAINT

The following allegations are taken from the complaint and the documents on which it relies.  For purposes of these motions, the following allegations are assumed to be true.

Jurisdiction

The court has diversity jurisdiction over this action.  Prickett is a citizen of South Carolina, and from a review of the record, it appears that none of the defendants are citizens of South Carolina.  Prickett seeks more than $75,000 in damages.

The Parties

Plaintiff F. Daniel Prickett purchased a variable life insurance policy ("VUL") from defendant New York Life Insurance Company in 2003.  According to the language of the policy, the policy was only available to "Accredited Investors" and "Qualified Purchasers" within the meaning of the federal securities laws, designations which apparently only apply to investors with high income and net worth, and significant investment experience.

Defendants New York Life Insurance Company and New York Life Insurance and Annuity Corporation ("NYLIAC") are corporations offering

various insurance products, such as the VUL at issue here.   NYLIAC is a wholly-owned subsidiary of New York Life Insurance Company.   Collectively, these companies will be referred to as "New York Life."

Defendant Tremont Capital Management Inc. ("Tremont Capital") was formerly known as Tremont Advisors, Inc.  Defendant Tremont (Bermuda) Ltd. ("Tremont Bermuda") is wholly-owned by Tremont Capital.  Defendant Tremont Group Holdings ("Tremont Group") is an investment manager of "fund-of-funds" products and multi-manager portfolios.  Defendant Tremont Partners, Inc. ("Tremont Partners") is a subsidiary of Tremont Group.  Defendant Rye Investment Management ("Rye") is a division of Tremont Group that manages, sells, and administers Tremont Group's "select manager funds."  Tremont Capital, Tremont Bermuda, Tremont Group, Tremont Partners, and Rye will sometimes be collectively referred to as "Tremont."

Defendant American Masters Opportunity Insurance Fund, L.P. ("Tremont Fund") is a Delaware limited partnership managed by Tremont.  This is the hedge fund in which Prickett directed New York Life to invest a portion of his premiums.  Tremont Partners is the general partner of the Tremont Fund. By virtue of its investment, New York Life became a limited partner in the Tremont Fund.

Defendants Rye Select Broad Market Prime Fund, L.P. ("Prime Fund") and Rye Select Broad Market XL Fund L.P. ("XL Fund") are Delaware limited partnerships managed by Rye.  Tremont Partners is the general partner of each of these funds.  Defendant Rye Select Broad Market Insurance Portfolio, LDC

("Rye Insurance Portfolio) is a Bermuda-incorporated "limited duration company," managed by Tremont Bermuda.  Collectively, these three hedge funds will sometimes be referred to as the "Rye Funds."

Defendant Oppenheimer Acquisition Corporation ("Oppenheimer") is the parent company of Tremont Group, which is in turn the parent company of Tremont Partners.  Oppenheimer owns more than 75% of Tremont Partners and is listed as a "control person" on Tremont Partners' Form ADV, a document that investment managers such as Tremont Partners file with the SEC. Defendant MassMutual Holding LLC ("MassMutual I") is Oppenheimer's parent company.  Defendant Massachusetts Mutual Life Insurance Company ("MassMutual II") is MassMutual I's parent company.  Collectively, these two companies will sometimes be referred to as "MassMutual" or the "MassMutual Defendants."  They are both listed as "control persons" on Tremont Partners' Form ADV.

The Dispute

As indicated above, Prickett purchased a VUL Policy from New York Life in May 2003.  The policy had a "face amount" of over $6 million dollars and Prickett paid an initial premium of $928,044.90.

A VUL policy is a type of life insurance policy that enjoys special tax advantages under the United States Internal Revenue Code, allowing a policy holder to build a "cash value" that can be invested in a choice of "Separate Accounts," similar to mutual funds.  These Separate Accounts can be invested in underlying portfolios of securities.  The investment returns on these

Separate Accounts remain tax free so long as certain requirements of the Internal Revenue Code are met, which generally require that the investments be sufficiently diversified and that the insurance company, not the policyholder, retain control over and ownership of the investments.  For example, if the policyholder wishes to invest in a hedge fund, the policyholder directs the insurer, New York Life, to invest some of the cash value in the hedge fund, and New York Life then becomes a limited partner in the hedge fund.

In May 2004, Prickett directed New York Life to invest in the Tremont Fund.  The initial investment was approximately $400,000; this investment grew to over $1 million dollars by October 2008.  New York Life became a limited partner in the Tremont Fund pursuant to a limited partnership agreement.  As described above, the Tremont Fund, with Tremont Partners serving as its general partner, allocated 22% of its assets to the Rye Funds. Substantially all of this money went to Madoff and has been lost.  Prickett has lost the portion of his investment which Tremont Fund entrusted to the Rye Funds.

Prickett alleges that all of the defendants violated duties owed to him in their conduct in this transaction.

With respect to New York Life, Prickett alleges that, as Prickett's insurer under the Policy, New York Life owed him duties, including fiduciary duties, "duties under the implied covenant of good faith and fair dealing and the duty not to misrepresent the appropriateness of the investments it offered through the Policy."  The Policy gave New York Life discretion to "deem investments

inappropriate for its policyholders." Plaintiff alleges that, given the "numerous
red flags concerning Madoff's fraudulent scheme," (which are detailed below)
New York Life breached its duties to Prickett by "fail[ing] to perform even the
most rudimentary analysis of the suitability of the investment funds [such as
the Tremont Fund] that it offered to policyholders."

In a Private Placement Memorandum, pursuant to which New York Life
solicited Prickett to purchase his VUL policy, New York Life informed Prickett
that it retained the "exclusive right to select the investments of the Separate
Account Subaccounts." This right included the rights to, *inter alia*, make
transfers of assets from one Separate Account to another, manage a Separate
Account, substitute the underlying portfolios from any Separate Account, and
change the "investment policy" of a Subaccount. Prickett's VUL Policy itself set
forth similar rights. New York Life also promised to notify Prickett of any
"material change" in his "underlying portfolio." Prickett also alleges that New
York Life issued periodic statements that misrepresented the value of Prickett's
investment in the Tremont Fund.

New York Life's PPM also incorporated by reference the Tremont Fund's
PPM. Prickett seeks to hold New York Life not only responsible for the
representations in its own PPM, but for the representations in the incorporated
Tremont PPM. The Tremont PPM represented that the Tremont Fund would
utilize an "opportunistic," "multi-manager" approach to achieve a "diversified"
portfolio of securities, which would be achieved by use of a "broad range of
investment strategies," which are detailed at length in the PPM. The

"multi-manager" approach was that Tremont would select a number of different managers to manage portions of the money invested in the Tremont Fund. These managers would utilize different investment strategies, in the hope that such strategies would complement each other and offset risks of each strategy. The Tremont PPM represented that Tremont would actively manage and monitor the diversified portfolio of the Tremont Fund.

Prickett alleges that many of these statements were false.  For instance, he alleges that the representations about the "opportunistic, multi-manager" approach and the "diversified portfolio" were belied by the fact that the Tremont Fund invested, through the Rye Funds, with Madoff—who did not invest in any securities, much less a diversified portfolio of securities.  Prickett also asserts that the representations about Tremont "actively managing" and monitoring the Tremont Fund's investments must have been false, as it was in reality Madoff who was managing 22% of the investment.

Tremont also represented that it would conduct due diligence and prudently select managers, including on-site interviews of managers and evaluations of their back office operations and internal staff, as well as ongoing performance monitoring of the investment managers.  Prickett alleges that Tremont did not do these things, and that if Tremont had done the diligence, monitoring and managing it promised to do, it would have discovered that Madoff was not making any trades with the money Tremont entrusted to him. Absent such due diligence and monitoring, Prickett also alleges that New York Life's representation that it would promptly notify him of "material changes" in

- 7 -

the underlying portfolio of securities was false because the investment was not subject to sufficient oversight to allow New York Life to do this.

Prickett alleges that defendants failed to live up to their representations out of a desire to collect their fees.  However, Prickett acknowledges that only New York Life and Tremont Partners obtained fees from Prickett.  According to Prickett, this desire to earn fees resulted in defendants' ignoring or not noticing a host of "red flags" that are detailed at length in the complaint, which Prickett alleges should have put defendants on notice of Madoff's fraud.

The "red flags" described by Prickett include the following:

- The lack of transparency in Madoff's operation;

- Madoff's abnormally high and consistent returns;

- The inconsistency between BMIS's publicly available financial information and the purported amounts that Madoff managed for clients;

- BMIS's small, obscure accounting firm;

- The inability of other funds using a "split-strike conversion" method (which Madoff purportedly used) to replicate Madoff's returns;

- Madoff acted as his own prime broker and BMIS did not use an independent custodian to hold its securities;

- BMIS generated revenue only through transaction-based commission fees instead of more typical management fees based on the performance of the fund;

- Monthly account statements sent to Madoff's investors did not support the returns they reported;

- In 1999 and 2005, one of Madoff's competitors, Harry Markopolis, sent the SEC a detailed letter claiming that Madoff Securities is the "world's largest Ponzi scheme";

- BMIS's comptroller was based in Bermuda, while "most mainstream hedge funds have in-house comptrollers";

- Other investors who conducted due diligence on Madoff and/or the Rye Funds became suspicious of Madoff's results and advised clients not to invest with Madoff and avoiding investing with him themselves;

- The SEC filed a lawsuit in 1992 against accountants who sold unregistered securities to 3,200 people, promising 13.5 to 20 percent returns by investing the money with Madoff (Madoff was not charged with misconduct);

- Articles in MAR/Hedge and Barrons, published in May 2001, reported on Madoff's secrecy and the fact that others had failed to replicate his returns, suggesting that Madoff was using illegal methods to generate such returns.

Prickett alleges that these red flags were "known to Defendants prior to and throughout the time period that Plaintiff held an interest in the Tremont Fund through the Policy." However, Prickett alleges no additional facts to support this allegation. Prickett also alleges in the alternative that the defendants acted with "willful blindness" and "willfully ignored" these red flags and that, if they had performed as represented, their investigation of Madoff would have "raised questions" that would have caused them not to invest with Madoff. Regarding Tremont, Prickett alleges that its long-standing and close relationship with Madoff should have made it aware of these red flags.

Prickett claims that defendants' conduct resulted in the "decimation" of the Separate Account component of his insurance policy, leaving him "without the funds he believed he had accumulated over time" and subject to potential "unexpected and disadvantageous income tax consequences." He also suffered

various other losses, including a portion of his investment in the Tremont Fund, taxes paid on "nonexistent earnings," his share of the fees earned by defendants, and the opportunity to make other investments.

Prickett makes separate allegations concerning Oppenheimer and MassMutual. As described above, Oppenheimer is the parent of Tremont Group. MassMutual I is the parent of Oppenheimer and MassMutual II is the parent of MassMutual I. Prickett alleges that Oppenheimer purchased Tremont Advisers (the company that is now known as Tremont Group) based on a desire to gain access to Madoff. During this transaction, Oppenheimer conducted due diligence on Tremont Advisers, with a focus on Tremont's relationship with Madoff. Prickett alleges, without factual support, that such due diligence turned up many of the warning signs discussed above, which Oppenheimer ignored or recklessly disregarded.

The complaint alleges that Tremont Group and its subsidiaries functioned "under the MassMutual Financial Group umbrella" and that MassMutual and Oppenheimer had "deep involvement in and control over" Tremont Group's operations. The allegations of control appear to rely solely on the ownership of Tremont Group and the fact that Oppenheimer appointed certain individuals to be directors on Tremont's board of directors who also held positions with Oppenheimer and/or MassMutual.

Finally, although the Rye Funds are named as defendants, the complaint alleges no particular representations made by them.

Risk Factors and Warnings in the Governing Documents

- 10 -

Although not mentioned in the complaint, Prickett's VUL Policy, New York Life's PPM, and the Tremont PPM contain warnings of risk factors and explanations about how the transaction would be structured, which should be summarized here.

The New York Life PPM stated that a VUL policy was "suitable only for individuals and entities of substantial economic means . . . [who] are familiar with and understand the fundamental risks and financial hazards of purchasing the Policy," and as described above, to that effect the Policy indicated that it was only available to investors who were Accredited Investors and Qualified Purchasers within the meaning of the federal securities laws. The PPM repeatedly cautioned that investing in a VUL policy offers "substantial risk," including that the entire investment may be lost.  The PPM also noted that "the theories behind the investment strategy of a Fund may be untested and may be difficult or impossible to execute," that investment in a fund "may entail more risks than traditional investments," and that "THERE CAN BE NO ASSURANCE THAT ANY FUND WILL ACHIEVE ITS INVESTMENT OBJECTIVE." Prickett was cautioned to make his own "evaluation of the risk of investing in the Policy," and was urged to "seek independent advisory services with regard to the legal, economic, tax, and related matters concerning the purchase of the Policy."  The PPM also made clear that Tremont, not New York Life, would be responsible for selecting the Tremont Fund's investment strategies.  It noted that the general partner "is responsible for selecting the Partnership's Managers, allocating assets among Managers and monitoring the Partnership's

investments," and that, "the Limited Partners cannot take part in the management or control of the Partnership's business, which is the sole responsibility of the General Partner," who has "wide latitude in making investment decisions." The VUL policy also detailed the various fees and charges to be paid to New York Life.

The Tremont PPM cautioned Prickett that he would not be able to have any contact or relationship with Tremont. In particular, the PPM noted that in

> an effort to prevent the [policyholders] from being treated as the owners of the assets of a portfolio for Federal tax purposes, the General Partner has sole discretion in determining the allocation of portfolio assets. In this regard, the [policyholders] do not have any right to require the General Partner (or any Manager) to acquire or dispose of any particular asset. . . . The General Partner (and any Manager) will not directly or indirectly consult with or receive, require or rely upon the advice of any person which the General Partner or Manager) knows or should know is a [policyholder].

The Tremont PPM also cautioned prospective investors that investment in the Tremont Fund "is speculative and involves a high degree of risk." It warned that the overall "success of the Partnership will depend on (1) the ability of the General Partner to select Managers and to allocate the assets among them, and (2) the Managers' ability to be successful in their respective strategies," adding that, "[t]here can be no guarantee of future performance and there is no assurance that the Partnership will be able to achieve its investment objective or be profitable." It warned that the General Partner may invest in other partnerships that it manages or advises (such as the Rye Funds). It also warned that the success of the Fund is "highly dependent upon the expertise and abilities of the underlying Managers, which will have investment discretion

over the Partnership's assets." It further noted that managers chosen by the general partner "are granted full discretion over all matters relating to the manner, method and timing of investment and trading transactions with respect to the Partnership's assets allocated to the Manager," with the result being that the Tremont Fund "will not have direct control" of its assets "once they are allocated among the Managers."  The PPM also warned that the Tremont Fund might not be able to obtain detailed information from the underlying managers about the investments being made.  The Tremont PPM and the limited partnership agreement inform investors that Tremont Partners would be paid management fees generally between .75% and 1.25% of an investor's interest.

The Claims and the Motions

Count 1 is for common law fraud against all defendants.  Count 2 is for negligent misrepresentation against all defendants.  Count 3 is for unjust enrichment against all defendants.  Count 4 is for breach of fiduciary duty against New York Life and Tremont.  Count 5 is for aiding and abetting fraud and breaches of fiduciary duty against Tremont, Oppenheimer, and MassMutual.  Count 6 is for breach of contract against New York Life.  Count 7 is for breach of the implied covenant of good faith and fair dealing, against New York Life.  Finally, Count 8 is for a violation of New York General Business Law § 349 against New York Life and Tremont.

Defendants move to dismiss all claims for failure to state a claim.

## **DISCUSSION**

Count 1: Common Law Fraud

Prickett is pursuing a common law fraud claim against all defendants, alleging that, in reliance on fraudulent misstatements of defendants, he purchased, through the Separate Account component of his VUL Policy, an investment in Tremont Fund, which subsequently invested with Madoff through the Rye Funds. Although defendants make numerous arguments as to why this claim should be dismissed, the dispositive argument is that Prickett has not sufficiently pleaded that the defendants acted with scienter.

Under New York law, the elements of a fraud claim are "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." Crigger v. Fahnestock & Co., 443 F.3d 230, 234 (2d Cir. 2006). Claims of fraud are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b), "which requires that the plaintiff (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co., 375 F.3d 168, 187 (2d Cir. 2004) (internal quotation marks omitted).

Regarding the intent to defraud, the plaintiff must plead the "factual basis" giving rise to a strong inference of fraudulent intent. Landesbank

Baden-Wurttemberg v. Goldman, Sachs & Co., No. 11-4443, 2012 U.S. App.
LEXIS 7884, at *3-4 (2d Cir. Apr. 19, 2012).  This requires a showing that
defendants had either "motive and opportunity to commit fraud," or allegations
of "strong circumstantial evidence of conscious misbehavior or recklessness."
Id.  However, a general profit motive, such as the motive to earn fees, is not a
sufficient motive to commit fraud.  See id. at *4 (citing Novak v. Kasaks, 216
F.3d 300, 307 (2d Cir. 2000)); see also Zutty v. Rye Select Broad Mkt. Prime
Fund, L.P., No. 113209/09, 2011 WL 5962804, at *11 (N.Y. Sup. Ct. Apr. 15,
2011).

Even assuming for the sake of argument that every defendant made
material false representations to Prickett, the element of scienter has not been
sufficiently pleaded.  The complaint alleges, in conclusory fashion, that the
defendants were aware that their statements were false when they were made,
but there are no facts pleaded supporting that theory of knowing falsity, and
this conclusory pleading is insufficient.

Prickett also pleads that various "red flags" made it obvious that Madoff
was a fraud, which defendants willfully or recklessly ignored, but this
argument fails because Prickett does not allege facts plausibly suggesting that
defendants were aware of these red flags, or that if they were aware, they then
translated those red flags into a suspicion of fraud.  See Saltz v. First Frontier,
L.P., 11-265-cv, 2012 U.S. App. LEXIS 11837, at *9 (2d Cir. June 12, 2012)
(noting that allegations of red flags are insufficient to plead the required strong
inference, in part because the plaintiff makes no allegation supporting the

conclusion that the defendant was aware of them).[1]  Courts have routinely

rejected Prickett's theory of scienter.  See, e.g., id.; Merkin v. Gabriel Capital,

L.P., 817 F. Supp. 2d 346, 357 (S.D.N.Y. 2011) (holding that allegations of

Madoff-related red flags do not adequately plead scienter even where defendant

admitted in sworn testimony that he was aware that other investors were

suspicious of Madoff, and where it was alleged that defendant kept copies of

May 2001 Barron's and MAR/Hedge articles, which discussed belief of hedge

fund professionals and market strategists that Madoff was using illegal

methods).

Nor has Prickett suggested any motive for any defendant to defraud him,

besides the fees received by New York Life and Tremont Partners, and as

described above, the profit motive common to all businesses is insufficient to

establish scienter.  Moreover, the failure to conduct due diligence or monitoring

as promised, without more, does not support an inference that the defendants

acted with scienter.  See South Cherry Street, LLC v. Henessee Group LLC, 573

F.3d 98, 113-14 (2d Cir. 2009).[2]

Prickett argues that the court should rely on Anwar v. Fairfield

---

[1] It is also apparent that some of the red flags are things that the defendants
would not likely have known about, such as the SEC's 1992 lawsuit against
two accountants who were selling unregistered securities and promising high
returns through investment with Madoff (Madoff was not charged with any
wrongdoing), two letters from Harry Markopolis to the SEC accusing Madoff of
fraud, the fact that other companies conducting diligence on Madoff-invested
funds decided not to invest, and two magazine articles questioning Madoff's
secrecy and investment methodology (both published in 2001).
[2] An additional ground for dismissing this claim with respect to MassMutual,
Oppenheimer, and the Rye Funds is that none of these defendants made any
statements to Prickett at all, much less misstatements that he relied on in
purchasing his policy or investing in the Tremont Fund.

Greenwich, Ltd., 728 F. Supp. 2d 372, 408-10 (S.D.N.Y. 2010), where the court found that the plaintiff had adequately pleaded the element of scienter.  But that case only serves to highlight the insufficiency of Prickett's scienter allegations.  In Anwar, there were allegations that, beyond the alleged "red flags", two of the directors of defendant Fairfield Greenwich ("FG") had conversations with Madoff before a meeting with the SEC where Madoff coached them on what to say.  The call began with Madoff saying "this conversation never happened" and was designed to thwart the SEC's investigation.  Id. at 408.  There were also emails between officers at FG discussing the gaps in their knowledge about even the basics of Madoff's operations.  Id. at 409.  Here, there are no facts plausibly suggesting that any defendant participated in conduct similar to that in Anwar.

Accordingly, Prickett has not supplied the court with facts sufficient to support a strong inference that any defendant made false representations to him with scienter.  To the contrary, as this court has previously held, "the more compelling inference as to why Madoff's fraud went undetected for two decades was his proficiency in covering up his scheme and deceiving the SEC and other financial professionals."  See Meridian Horizon Fund, LP v. Tremont Group Holdings, Inc., 747 F. Supp. 2d 406, 413 (S.D.N.Y. 2010), aff'd sub nom. Meridian Horizon Fund, L.P. v. KPMG (Cayman),Nos. No. 11-3311-cv, No. 11-3725-cv, 2012 U.S. App. LEXIS 14013 (2d Cir. Jul. 10, 2012).

Accordingly, plaintiff's common law fraud claim is dismissed as to all defendants.

Count 2: Negligent Misrepresentation

It is possible that there is a valid negligent misrepresentation claim on this case against some defendant or defendants. However, it cannot be that all defendants stand on the same ground, and can be lumped together without differentiation as is done in Count 2. Therefore, Count 2 is dismissed with leave to re-plead, if this can be done, with specific allegations as to specific defendants.

Counts 3 and 4: Unjust Enrichment and Breach of Fiduciary Duty

Count 3 is for unjust enrichment against all defendants, alleging that defendants received "excessive revenue" from the management fees they collected.  New York Life and Tremont each allegedly received management fees from Prickett.  Count 4 is for breach of fiduciary duty against New York Life and Tremont, alleging that New York Life and Tremont owed Prickett duties to "use due care in the investigation, recommendation, management, and supervision of the invested assets of Plaintiff."  Prickett alleges that such duties were breached by the failure to perform appropriate oversight and diligence on the Tremont Fund and the Rue Funds, leading Prickett to lose a "substantial part of his investment."

Tremont argues that Prickett does not have standing to bring these claims.  All defendants argue that the unjust enrichment claim fails on the merits.  Additionally, Tremont and New York Life argue that they had no fiduciary duty to Prickett.

Prickett's Standing to Sue Tremont

Tremont argues that Prickett's unjust enrichment and breach of fiduciary duty claims against it are derivative claims and that Prickett lacks standing to bring them.  If they are derivative claims, they may only be brought by Tremont Fund, or by investors in the Tremont Fund, such as New York Life, in an appropriate derivative suit on behalf of the Tremont Fund.  Prickett, who is not even an investor in the Tremont Fund, has attempted to bring these claims on his own behalf.  As such, if the court finds that these claims are appropriately classified as derivative claims, it should dismiss them for lack of standing, but Prickett can pursue these claims if the court finds they are direct claims.

This court applies New York choice of law rules to adjudicate plaintiffs' state law claims.  Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496 (1941).  Prickett argues that New York's choice of law rules dictate that New York law should apply to determine whether his claims are direct or derivative.  Defendants contend that Delaware law applies because Prickett's standing to bring these claims concerns the internal affairs of the Tremont Fund, a limited partnership.

Under New York's Limited Partnership Law, § 121-901, "the laws of the jurisdiction under which a foreign limited partnership is organized govern its organization and internal affairs."  See id.; Zutty, 2011 WL 5962804, at *7 (applying Delaware law to determine whether limited partner had standing to pursue claims).  The Tremont Fund is a limited partnership organized under the laws of Delaware.   Thus, applying New York choice of law rules, the issue of whether the claims concerning plaintiff's investment in the Tremont Fund,

through New York Life, are derivative or direct is determined by reference to

Delaware law.  See id.; Saltz v. First Frontier, LP, 782 F. Supp. 2d 61, 79

(S.D.N.Y. 2010), aff'd 2012 U.S. App. LEXIS 11837 (applying Delaware law to

determine whether breach of fiduciary duty, unjust enrichment, and aiding and

abetting breach of fiduciary duty claims were derivative).

     To determine whether a claim is derivative under Delaware law, courts

consider: "Who suffered the alleged harm--the corporation or the suing

stockholder individually--and who would receive the benefit of the recovery or

other remedy?"  Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031,

1035 (Del. 2004).  The fact that a shareholder may ultimately suffer some loss

does not make the claim direct.  Feldman v. Cutaia, 951 A.2d 727, 733 (Del.

2008).  Rather, where "all of a corporation's stockholders are harmed and

would recover *pro rata* in proportion with their ownership of the corporation's

stock solely because they are stockholders, then the claim is derivative in

nature."  Id.  To state a direct claim, "the plaintiff must have suffered some

individualized harm not suffered by all of the stockholders at large."  Id.[3]

     Regarding the unjust enrichment fees, the claim is that Tremont received

"excessive revenues from the fees they collected based on the policy's cash

value" and that it would be inequitable for Tremont to retain the benefit.

However, Tremont was paid fees by the Tremont Fund, pursuant to the limited

partnership agreement governing the Tremont Fund and its partners.  The

---

[3] This analysis applies not only to corporations, but also to limited
partnerships.  See Albert v. Alex. Brown Mgmt. Servs., Inc., No. Civ.A. 762-N,
2005 WL 2130607, at *12 (Del. Ch. Aug. 26, 2005).

harm, if such occurred, was the harm to the Tremont Fund from Tremont's mismanagement of the Tremont Fund or collection of excessive fees from the Tremont Fund. Any valid claim would be a derivative claim on behalf of the Tremont Fund.  See Stephenson v. Citco Group Ltd., 700 F. Supp. 2d 599, 612 (S.D.N.Y. 2010); Saltz, 782 F. Supp. 2d at 79.

The breach of fiduciary duty claim is also derivative.  The alleged duty is the duty which Tremont owed to the Tremont Fund, and any breach of that duty would be a harm to that fund and all investors in that fund. Therefore this claim is a derivative claim.

Accordingly, Prickett's claims for unjust enrichment and breach of fiduciary duty against Tremont are derivative and Prickett lacks standing to pursue them.  An additional consequence of the dismissal of these claims against Tremont is that these claims should be dismissed as against Oppenheimer and MassMutual, whose only involvement in this case consists of allegedly controlling Tremont.

Merits of Unjust Enrichment Claim

A claim for unjust enrichment requires that the "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." Diesel Props S.R.L. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 55 (2d Cir. 2011).  A "valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."  U.S. East Telecomm., Inc. v. U.S. West Commc'n

Servs, Inc., 38 F.3d 1289, 1296 (2d Cir.1994) (quotation omitted).  "This is true
whether the contract is one between parties to the lawsuit, or where one party
to the lawsuit is not a party to the contract." Granite Partners, L.P. v. Bear,
Stearns & Co., 17 F. Supp. 2d 275, 311 (S.D.N.Y. 1998).

The claim should be dismissed as against all defendants besides New
York Life and Tremont Partners for the additional reason that Prickett does not
even allege that the other defendants received any fees from him.

Also, there are two contracts covering the subject matter of this action,
which preclude an action for unjust enrichment.  Although this claim is alleged
against all defendants, the complaint only alleges that New York Life and
Tremont Partners, and none of the other defendants, received excessive fees.
However, Prickett entered into an insurance policy—a contract—with New York
Life, which detailed the fees and premiums Prickett would have to pay.  Thus
the unjust enrichment claim against New York Life is clearly duplicative of the
breach of contract claim Prickett also pursues in this action.  See Granite
Partners, 17 F. Supp. 2d at 311.  Regarding the unjust enrichment claim
against Tremont Partners based on fees paid to it, New York Life entered into a
limited partnership agreement when it invested in the Tremont Fund, which
governed the rights and obligations of investors in the Tremont Fund, including
the fees paid to Tremont Partners.  Prickett argues that because he was not a
party to this agreement, he should be able to pursue his claim for unjust
enrichment against Tremont.  But as described above, the transaction was
structured such that Prickett could not be a limited partner, for his own

benefit.  There is a written contract governing Tremont's conduct in relation to the Tremont Fund, and the fees paid to Tremont Partners, and as described above, the Tremont Fund has standing to enforce this agreement—and Prickett does not.  Thus the claim against Tremont Partners is barred by the limited partnership agreement.

Therefore, Prickett's unjust enrichment claim should be dismissed on the merits.

### Merits of Breach of Fiduciary Duty Claim

To prevail on a claim for breach of fiduciary duty, plaintiff must plead that defendants owed him a fiduciary duty and that they breached that duty. Thermal Imaging, Inc. v. Sandgrain Sec., Inc., 158 F. Supp. 2d 335, 343 (S.D.N.Y. 2001).  New York law recognizes a fiduciary relationship "when one person is under a duty to act for or to give advice for the benefit of another within the scope of the relation." Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A., No. 03 Civ. 1537(MBM), 2003 WL 23018888, at *15 (S.D.N.Y. Dec. 22, 2003) (quoting Levitin v. PaineWebber, Inc., 159 F.3d 698, 707 (2d Cir.1998)).  Ordinarily, arms-length commercial transactions, including insurance transactions, do not give rise to fiduciary relationships.  See Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue Shield, 276 F.3d 123, 130 (2d Cir. 2002); Batas v. Prudential Ins. Co. of Am., 281 A.D.2d 260, 263, 724 N.Y.S.2d 3, 7 (2001).

With respect to New York Life, there was an arms-length insurance contract between sophisticated parties.  Regarding Tremont, as described

above, Tremont was prohibited from having any contact with Prickett, and no facts are alleged suggesting that Tremont had any direct business relationship with Prickett.  Tremont did not assume any duty to "act for" or "give advice to" Prickett; Tremont's relation was with its investor, New York Life, whose money to fund the investment came from policyholders.  See Thermal Imaging, 158 F. Supp. 2d at 343.  Contrary to Prickett's argument, Tremont did not serve as an investment advisor for Prickett; Tremont served as an investment advisor to the Tremont Fund, whose limited partners included New York Life, but not Prickett.

Therefore, the claim for breach of fiduciary duty should be dismissed on the merits.

Count 5: Aiding and Abetting Fraud and Breaches of Fiduciary Duty

Count 5 is for aiding and abetting fraud and breach of fiduciary duty against Tremont, Oppenheimer, and MassMutual, alleging that these defendants knew of the breaches of fiduciary duty by the Tremont Fund, Rye, and the Rye Funds and substantially assisted in those breaches.

"Under New York law, the elements of aiding and abetting a breach of fiduciary  duty,  . . . and aiding and abetting a fraud are substantially similar. The claims require the existence of a primary violation, actual knowledge of the violation on the part of the aider and abettor, and substantial assistance." Kirschner v. Bennett, 648 F. Supp. 2d 525, 533 (S.D.N.Y. 2009).

With the dismissal of all claims for fraud and breach of fiduciary duty, the claim for aiding and abetting should be dismissed for failure to plead a

primary violation.  See id.  Dismissal is additionally appropriate because the complaint contains no non-conclusory allegations suggesting that these defendants knew that other defendants were breaching duties to Prickett, much less substantially assisted with such breaches.

Count 6: Breach of Contract

Count 6 is for breach of contract against New York Life, alleging that New York Life failed to (1) perform due diligence prior to adding the Tremont Fund to the list of hedge funds in which policyholders are permitted to invest their excess insurance premiums; (2) monitor the Tremont Fund such that New York Life could notify Prickett of any "material change" in the Tremont Fund; (3) make available to Prickett only funds that are "true investment vehicles" which "adhere to a specific investment philosophy or philosophies and are not a sham"; and (4) reasonably exercise its "sole discretion" to close any Separate Account that invests in funds that are illegitimate or otherwise misappropriates policyholders' funds.

A claim for breach of contract under New York law requires "(1) the existence of a contract between [the plaintiff] and th[e] defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by th[e] defendant; and (4) damages to the plaintiff caused by th[e] defendant's breach." Diesel Props, 631 F.3d at 52.

New York Life argues that the Policy does not obligate it to do any of the four things described above.  Prickett counters that New York Life "reserved extensive and exclusive rights to manage" his investment, and that the PPM

makes clear that New York Life's rights were to be exercised "for the Plaintiff's benefit to ensure that his investment is adequately diversified." According to Prickett, New York Life breached the contract by failing to "exercise" its contract "rights" "for their intended purpose."

This claim should be dismissed because Prickett has not pointed to any affirmative duty in the contract that was breached by New York Life. It is true that New York Life had certain rights under the contract, to make changes to the list of investments and to take certain investment options (such as the Tremont Fund) off of the list of investments for policyholders. Had these rights been vigorously exercised, they potentially could have led New York Life to question the suitability of investing in a fund exposed to Madoff and to take the Tremont Fund off of the list of investment options for policyholders. But the contract says that New York Life <u>may</u> do these things and has <u>discretion</u> to do these things; it does not say that New York Life <u>must</u> do those things. In particular, nothing in the Policy requires New York Life to conduct due diligence on the Tremont Fund or otherwise monitor the investments being made by the underlying hedge funds in which the Tremont Fund invests. Moreover, the Tremont Fund was not, as Prickett suggests, a "sham" investment; the fact that 22% of its assets were invested in the Rye Funds and misappropriated by Madoff does not make the entire fund a sham.

Because Prickett has not pleaded that New York Life breached any contractual duties—as opposed to merely not doing things it had a right, but no obligation, to do—the court dismisses his breach of contract claim.

<u>Count 7: Breach of Implied Covenant of Good Faith and Fair dealing</u>

Count 7 is for breach of the implied covenant of good faith and fair dealing against New York Life. The court will not engage in extensive discussion but simply asserts that the complaint does not make any substantive allegations of conduct by New York Life amounting to bad faith or unfair dealing.

<u>Count 8: GBL § 349</u>

Count 8 is for a violation of New York General Business Law § 349 against New York Life and Tremont, accusing them of "deceptive acts and practices in the conduct of business or in the furnishing of a service."

New York's General Business Law § 349 provides that deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are unlawful.  A claim under § 349 of the GBL requires a showing of "consumer-oriented conduct that is materially deceptive and causes injury to the plaintiff." <u>Shou Fong Tam v. Metro. Life Ins. Co.</u>, 913 N.Y.S.2d 183, 185 (1st Dep't 2010).  To be consumer-oriented, the conduct must have a "broad impact on consumers at large." <u>U.W. Marx, Inc. v. Bonded Concrete, Inc.</u>, 776 N.Y.S.2d 617, 619 (3d Dep't 2004).  Although "disputes involving insurance transactions can fall within the ambit of General Business Law § 349 . . . private contractual disputes upon matters not affecting the consuming public are not actionable." <u>Shou Fong Tam</u> 913 N.Y.S.2d at 185-86.

The "clear weight of authority is that claims arising out of securities

transactions are not the type of consumer transactions for which General Business Law § 349 was intended to provide a remedy."  Gray v. Seaboard Sec., Inc., 788 N.Y.S.2d 471, 473 (3d Dep't 2005) (holding that suit against broker for failing to provide investment advice was "ancillary to securities transaction" and did not state a claim under GBL § 349); see also Feesha v. TD Waterhouse Inv. Servcs., 761 N.Y.S.2d 22, 23-24 (1st Dep't 2003) ("[GBL § 349] is inapplicable to securities transactions.").  The two justifications for the exclusion of securities transactions from the ambit of § 349 are that (1) individuals do not generally purchase securities in the same manner as traditional consumer products, such as vehicles, appliances or groceries since securities are purchased as investments, not as goods to be 'consumed'  or 'used', and (2) because the securities industry is highly regulated by the federal government, it is questionable that the legislature intended to give securities investors an added measure of protection beyond that provided by securities acts.  Gray, 788 N.Y.S.2d at 472 (quoting Morris v. Gilbert, 649 F. Supp. 1491, 1497 (E.D.N.Y.1986)).

    Here, Prickett's GBL § 349 claim arises out of his purchase of the New York Life VUL and subsequent allocation of his cash value to the Tremont Fund, causing New York Life to invest in the Tremont Fund through the Separate Account feature of his VUL (a purchase of securities by New York Life).  The allocation of Prickett's cash value to the Tremont Fund was clearly intended as a way of giving Prickett tax free exposure to returns on an investment in a portfolio of underlying securities, not as goods to be

'consumed' or used.  Prickett claims that New York Life misrepresented the nature of the monitoring it would do of his investment in a portfolio of <u>securities</u> and that Tremont misrepresented the diligence, monitoring, and investment strategies it would undertake with respect to the Tremont Fund and, in particular, the diligence, monitoring, and investment strategies that would be undertaken with regard to the managers who would invest the Tremont Fund's assets in <u>securities</u>.

Not all New York courts agree that securities-related transactions are exempted from § 349 of the GBL.  The New York Court of Appeals has not spoken on the issue.  The Appellate Division for the Fourth Department has issued conflicting decisions. <u>Smith v. Triad Mfg. Group, Inc.</u>, 681 N.Y.S.2d 710, 712 (4th Dep't 1998) (holding that GBL § 349 does not apply to securities transactions); <u>Scalp & Blade v. Advest, Inc.</u>, 722 N.Y.S.2d 639, 641 (4th Dep't 2001) (holding that GBL § 349 applies to securities transactions). The Second Department has allowed a securities-related claim to proceed. <u>B.S.L. One Owners Corp. v. Key Ont'l Mfg. Inc.</u>, 640 N.Y.S.2d 135, 137 (2d Dept 1996) (declining to dismiss GBL § 349 claim alleging misrepresentation in connection with sale of securities in cooperative condominium). However, the First and Third Departments have consistently held that § 349 does not apply to securities-related transactions as illustrated by <u>Gray</u>. 788 N.Y.S.2d at 473; <u>Feesha</u>. 761 N.Y.S.2d at 24.  Numerous federal district courts have held that § 349 does not apply to securities transactions.  <u>See</u>, <u>e.g.</u>, <u>Spirit Partners, L.P. v. audiohighway.com</u>, No. 99 Civ. 9020 (RJW), 2000 U.S. Dist. LEXIS 7236, at

*22-23 (S.D.N.Y. May 25, 2000) (collecting cases).  The apparent weight of authority and the current trend appear to be that § 349 claims are unavailable for securities-related transactions, like the one at issue here.  See Gray, 788 N.Y.S.2d at 473.

Leave to Amend

Prickett requests leave to amend his complaint if the court grants defendants' motion.  Prickett has filed an extensive complaint and the parties and the court have labored extensively over it. The court therefore believes that the complaint should be dismissed without leave to amend except as to Count 2, to which the court has already indicated an amendment may be attempted.

**Conclusion**

The motion is granted without leave to re-plead, except that Count 2 may be restated in accordance with directions in this opinion.

This opinion resolves the motions listed as document numbers 19, 23, 28, 30, and 34 in case number 09 Civ. 3137, numbers 695, 699, and 711 in case number 08 Civ. 11117, and number 181 in case number 09 Civ. 557.

So ordered.

Dated:  New York, New York
September 11, 2012

Thomas P. Griesa
U.S. District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: Sept 12, 2012

- 30 -