## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re TREMONT SECURITIES LAW, STATE LAW AND INSURANCE LITIGATION | Master Docket No. 1:08-11117 |
| This Document Relates to:<br><br>F. DANIEL PRICKETT,<br><br>                    Plaintiff,<br><br>      v.<br><br>NEW YORK LIFE INSURANCE COMPANY, NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION, TREMONT OPPORTUNITY FUND III, L.P., TREMONT GROUP HOLDING, INC., and TREMONT PARTNERS, INC.,<br><br>                  Defendants. | Civil Action No. 1:09-cv-03137 (TPG)<br><br>ECF CASE<br><br>JURY TRIAL DEMANDED |

### SECOND AMENDED COMPLAINT

Plaintiff F. Daniel Prickett ("Plaintiff"), by and through his undersigned counsel, brings this action based upon personal knowledge as to himself and his own acts, and on information and belief as to all other matters based on the investigation conducted by and through counsel, which included the review of complaints filed by the United States Government and the Securities and Exchange Commission (the "SEC"), news reports published in the financial press, and other available information.

### SUMMARY OF ACTION

1.     On May 12, 2003, New York Life Insurance and Annuity Corporation ("New York Life") sold Plaintiff a variable universal life insurance policy (the "Policy") with a face amount of $6,394,951.00 and an initial premium of $928,044.90.  In connection with Plaintiff's purchase, New York Life furnished Plaintiff a copy of the Policy and a "Variable Life Insurance

Policy Private Offering Memorandum" (the "NYL Offering Memorandum").  In these offering materials, New York Life represented that it would (1) maintain exclusive control and authority over investment decisions in Plaintiff's Subaccount; (2) invest Plaintiff's funds in a "managed," "underlying portfolio" of securities; (3) "monitor the performance" of that "Portfolio to review continuing compliance with diversification and investor control requirements" in the sense that it would "'look through' the fund" in which Plaintiff invests to review whether "the fund has adequately diversified its investments" in accordance with the tax code; and (4) "notify" Plaintiff of any "material change in the Underlying Portfolios."

2.      On March 26, 2004, unbeknownst to Plaintiff, New York Life, Tremont Partners, Inc. ("Tremont Partners"), and the Tremont Opportunity Fund III, L.P. (the "Tremont Fund") entered into a Participation Agreement.  Therein, New York Life and Tremont Partners expressly agreed that the Participation Agreement "should not be shown to prospective investors."  New York Life promised Tremont Partners that it would "make reasonable efforts to market" the Tremont Fund to variable universal life insurance policyholders such as Plaintiff.  New York Life also agreed to "promot[e] the [Tremont Fund] as an investment option under the Contracts." In that regard, New York Life agreed to "make . . . representations [and] statements *on behalf of the [Tremont Fund]* in connection with the sale of the Contracts" by furnishing potential investors the American Masters Opportunity Insurance Fund, L.P. Amended and Restated Confidential Private Placement Memorandum (the "Tremont PPM"), the Amended and Restated Limited Partnership Agreement of the American Masters Opportunity Insurance Fund, L.P. (the "LPA"), Tremont Partners' Form ADV filed with the SEC, and other "Establishing Documents." In return for promoting the Tremont Fund, Tremont Partners allowed New York Life to "withdraw amounts invested in the Tremont Fund to compensate [New York Life] for the

2

administrative, risk, and other expenses associated with the Variable Contracts, and to provide benefits under the Variable Contracts."

3.      In May 2004, in reliance on the Tremont PPM and other materials from New York Life and Tremont Partners, Plaintiff made an initial investment in the Tremont Fund of $426,106.82. Plaintiff continued to invest in the Tremont Fund, and by October 2008, Plaintiff's account statement indicated a balance of $1,138,697.62 in the Tremont Fund.

4.      In the Tremont PPM and the Tremont Fund's other Establishing Documents, Tremont Partners represented that it: (1) took great care in selecting and evaluating the Tremont Fund's investment managers; (2) undertook rigorous measures to monitor the performance and operations of the Tremont Fund's investment managers; and (3) managed the Tremont Fund according to a well diversified, multi-manager long-short equity trading strategy. For example, Tremont Partners made the following representations concerning Tremont Partners' careful selection and monitoring of the managers to whom Tremont Fund assets were entrusted:

a.      Tremont's purpose was to "provide investors with a diversified investment portfolio [] designed to result in above average returns over a long period of time" by delegating discretionary and other authority to manage the Tremont Fund's accounts to one or more Investment Advisors in Tremont's absolute discretion;

b.      In selecting these investment advisors, Tremont would "seek[] to select Managers that satisfy one or more criteria including, but not limited to: extensive investment management experience; successful historical performance, including a history of consistent returns with respect to the Manager's investment style; the degree to which a specific Manager complements and balances the [Tremont Fund's] Portfolio with respect to the strategies employed by other Managers; the quality and stability of the Manager's organization; the ability of the [Tremont Fund] to make withdrawals or liquidate its investment; and the ability of each Manager to consistently and effectively apply its investment approach;"

c.      In seeking to ensure that the selected Managers would satisfy these criteria, Tremont would "collect[], analyze[] and evaluate[] information regarding the personnel, history and background, and the investment

3

styles, strategies and performance of professional investment management firms;"

d.      Tremont would "request detailed information on a continuing basis from each Manager regarding the Manager's historical performance and investment strategies;" and

e.      Tremont would provide New York Life, as a limited partner of the Tremont Fund on Plaintiff's behalf, with annual reports audited by an independent certified public accountant.

5.      Thus, New York Life and Tremont Partners acted in concert to market and sell the Tremont Fund to Plaintiff and were fully aware of the representations that each made to induce Plaintiff to invest in the Tremont Fund.  However, in all their representations, neither New York Life nor Tremont disclosed that neither of them could verify that the Tremont Fund's principal manager was investing Plaintiff's funds in legitimate securities at all, much less securities consistent with their representations of diversity.  Indeed, if Tremont Partners ever performed such research, due diligence, and monitoring on any of the Tremont Fund's investment managers, Tremont Partners did *not* do so with respect to the Tremont Fund's largest and most important manager:  Bernard L. Madoff ("Madoff").  In fact, although Tremont Partners invested approximately 22% of the Tremont fund with Madoff, Tremont Partners kept Madoff's identity secret from Plaintiff and other policyholders, who had no opportunity to conduct their own research on his background.  Thus, Plaintiff did not know (and had no way to detect) that Madoff was embezzling his investments, or even involved in them.

6.      On December 10, 2008, Madoff informed certain senior employees at Bernard L. Madoff Investment Securities LLC ("BMIS") that his investment advisory business was a fraud.  Madoff stated that he was "finished," that he had "absolutely nothing," that "[i]t's all just one big lie," and that it was "basically, a giant Ponzi scheme."  Madoff communicated to the senior employees that he had for years been paying returns to certain investors out of the principal

received from other, different investors.  Madoff stated that the business was insolvent, and that it had been for years.  Madoff also stated that he estimated the losses from this fraud to be approximately $50 billion.

7.      On December 11, 2008, the SEC charged Madoff and BMIS with securities fraud in connection with a multi-billion dollar Ponzi scheme that Madoff and others perpetrated on investor clients of BMIS.  Also on December 11, 2008, Madoff and BMIS were criminally charged by the United States Attorney's Office for the Southern District of New York with securities fraud.  Madoff would eventually plead guilty to eleven federal crimes and admit to operating the largest Ponzi scheme in history.

8.      On or about December 12, 2008, Tremont Partners reported to its "clients" that it had a 14-year relationship with Madoff, and that Plaintiff, through his investments in Tremont, had a 22% exposure to Madoff.

9.      In 2012, New York Life and Tremont Partners revealed that even more than 22% of the Tremont Fund would be written down as a result of Tremont's settlement with Irving Picard, the court-appointed trustee under the Securities Investor Protection Act ("SIPA") in the liquidation of BMIS.

10.     Long before 2008, however, the warning signals that Madoff and BMIS were not legitimate operations were numerous and included, among others things, the following:

      a.      The lack of transparency into BMIS, including Madoff's refusal to disclose his investment strategy;

      b.      BMIS's returns were abnormally smooth with very little volatility, including only five months of negative returns in the past twelve years;

      c.      The inability of other funds using a "split-strike conversion" strategy (which Madoff purportedly used) to generate returns even remotely comparable to those generated by Madoff;

d.  Madoff acted as his own prime broker, while most hedge funds use large banks such as Goldman Sachs and Morgan Stanley as their prime brokers;

e.  Unlike most hedge funds, which charge investment management fees based on the performance of the fund, BMIS only generated revenue through transaction-based commission fees;

f.  Monthly account statements sent to Madoff's investors did not support the returns they reported;

g.  In 1999, one of Madoff's competitors, Harry Markopolos, sent a detailed letter to the SEC claiming that "Madoff Securities is the world's largest Ponzi Scheme";

h.  BMIS's auditor, Friegling & Horowitz, consisted of one office in Rockland County, New York, with three employees, one of whom was 78 years old and lived in Florida, and one of whom was a secretary;

i.  BMIS's comptroller was based in Bermuda, while most mainstream hedge funds have in-house comptrollers; and

j.  BMIS did not use an independent custodian to hold its securities.

11.     Thus, New York Life's and Tremont Partners' representations regarding Tremont Partners' oversight, thorough manager research, careful due diligence, risk allocation, portfolio monitoring and diversification of the Tremont Fund were negligently false and misleading.  If Tremont Partners had conducted anything near the sort of research, due diligence, and monitoring of the Tremont Fund's investment managers that Defendants represented, then the fraudulent operation of Madoff – the Tremont Fund's key manager and Tremont Partner's single most important business partner – would have been immediately apparent (as it was even to many far-removed members of the investment industry).

12.     Plaintiff seeks to recover damages caused by Defendants' negligent misrepresentations.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the Plaintiff is a citizen of a different state from every Defendant and because the amount in controversy exceeds $75,000.  Plaintiff is informed and believes that the citizenship of any and all individual partners of those Defendants which are partnerships and the individual members of those defendants which are limited liability companies are diverse from that of the Plaintiff.

14.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.  Substantial acts in furtherance of the alleged negligence and/or its effects have occurred within this District. Venue is also proper pursuant to the Order of Consolidation entered March 26, 2009 in *In re Tremont Securities Law, State Law and Insurance Litigation*, Master File No.: 08 Civ. 11117 [Docket #44].

## PARTIES

15.    Plaintiff is an individual residing in Kiawah Island, South Carolina.

**New York Life**

16.    Defendants New York Life Insurance Company and New York Life Insurance and Annuity Corporation (collectively referred to herein as "New York Life") are corporations organized and existing under the laws of the State of Delaware with their principal place of business at 51 Madison Avenue, New York, New York 10010.  Defendant New York Life Insurance and Annuity Corporation is a wholly-owned subsidiary of New York Life Insurance Company.

**Tremont**

17.     Defendant Tremont Group is an investment manager of fund-of-funds products and multi-manager portfolios.   According to its website, Tremont Group "has been at the forefront in setting the standard in the industry for fund of hedge funds investment management. Effective investment strategies and oversight, thorough manager research, careful due diligence, advanced risk allocation and time-tested portfolio management form the cornerstones of a comprehensive platform that has been refined over a 23 year span of dedicated strides to maximize our clients' objectives."  Tremont Group is the parent of Tremont Capital and Tremont Partners Inc. and is located at 555 Theodore Fremd Avenue, Rye, New York 10580.

18.     Defendant Tremont Partners is a subsidiary of Tremont Group that manages and/or serves as General Partner of several of the Tremont Group affiliated funds, including the Tremont Fund.  Tremont Partners is located at 555 Theodore Fremd Avenue, Rye, New York 10580.

19.     Defendant Tremont Fund, f/k/a American Masters Opportunity Insurance Fund, L.P., is a Delaware limited partnership managed by Tremont.  The Registered Office of the Tremont Fund is located at 1013 Centre Road, Wilmington, Delaware 19805-1297.  Tremont Partners is the General Partner of the Tremont Fund.  Through the Policy, Plaintiff had an investment in the Tremont Fund.

20.     Defendants Tremont Group, Tremont Partners, and the Tremont Fund are sometimes collectively referred to herein as "Tremont."

21.     Defendants New York Life and Tremont are collectively referenced herein as the "Defendants."

## PLAINTIFF'S SUBSTANTIVE ALLEGATIONS

**Variable Universal Life Insurance**

22.     Variable universal life ("VUL") insurance is a type of life insurance, first offered in the late 1980s, that enjoys special tax advantages under the United States Internal Revenue Code and allows a policy holder to build a cash value that can be invested in a choice of separate accounts, similar to mutual funds.  The number and type of investment choices available is dependent on the insurer.  The cash value in these policies is able to earn investment returns without incurring current income tax as long as the policy meets the definition of life insurance and the policy remains in force.  The tax free investment returns can be used to pay for the costs of insurance inside the policy.

23.     The "variable" component in the name refers to a VUL policy's "Investment Account" or "Separate Account" component, which varies in value because it is invested in the financial markets.  The "universal" component in the name refers to the flexibility the owner has in making premium payments.  The premiums may vary in a given month up to maximums defined by the Internal Revenue Code for life insurance.

24.     Under a VUL policy, the death benefit is the face amount of the policy plus the buildup of any cash value that occurs (beyond any amount being used to fund the current cost of insurance).  As long as there is sufficient cash value to pay the costs of insurance in the policy, the death benefit will be paid.  Additionally, tax-free policy loans to the policyholder (which would be paid off on death by the death benefit) are available from any excess cash value. VUL policies allow the policyholder a great deal of flexibility in choosing how much premium to pay for a given death benefit.  To maintain a death benefit guarantee, a specified premium level must be paid every month.  To keep the policy in force, typically no premium needs to be paid as long as there is enough cash value in the policy to pay that month's cost of insurance.

**New York Life Misrepresented the Policy**

25.     New York Life made numerous misrepresentations and omissions regarding the Policy, the kind of investment it represented, and the type of management and notice that New York Life would provide Plaintiff as a policyholder.

26.     New York Life's misrepresentations regarding Plaintiff's investment were contained in, *inter alia*, the Policy and the NYL Offering Memorandum.  In these offering materials, New York Life represented to Plaintiff that his investment would be placed in a "Separate Account," and within that, one or more "Subaccounts" that each constituted an investment in "shares or units" in "underlying portfolios" of "securities" managed by an "investment manager."

27.     In the NYL Offering Memorandum, New York Life described the Separate Accounts as follows:

> We have established and currently maintain the Separate Account under the laws of the State of Delaware. Any realized or unrealized income, net gains or losses from the assets of the Separate Account are credited or charged to without regard to Our other income, gains or losses, including income, gains or losses from Our other separate accounts. We put assets into the Separate Account that You have allocated to the Investment Divisions for the Policy, and We may also do the same for any other variable life insurance policies We may issue.

28.     New York Life further represented that Plaintiff's funds would be allocated, within the Separate Account, to one or more "Subaccounts" that would invest Plaintiff's funds in managed portfolios of securities:

> Net Premiums may be allocated among any of the available "Subaccounts" offered with this Policy.  Each Subaccount of each Separate Account invests in shares or units of a portfolio of securities managed by one or more Portfolio Managers (the "Portfolios" or "Underlying Portfolios").

29.     In the Policy, New York life similarly represented that the Subaccounts would invest Plaintiff's assets in "portfolios" of securities:

Registered Subaccounts invest their assets in Portfolios of one or more Registered Funds. Exempt Subaccounts invest their assets in Portfolios of one or more Exempt Funds.

30.    New York Life also stated that the Subaccounts would invest in portfolios that New York Life would "value" at a "fair value":

The assets of the Subaccounts will be invested in shares of corresponding Portfolios. The Portfolios will be valued at the end of the Valuation Period at a fair value.

31.    New York Life described "Exempt Subaccounts," through which New York Life offered the Tremont Fund, in similar terms as providing an investment in an "underlying portfolio" of securities:

An Exempt Subaccount is one that invests in shares (or units) of Underlying Portfolios that are not registered under federal securities law, and these portfolios can be expected to hold illiquid investments.

32.    In that regard, the New York Life defined "Portfolio" or "Underlying Portfolio" as "each series or investment pool of a Fund that corresponds with the specific investment objective of a Subaccount." New York Life defined "Fund" as "either a Registered Fund or an Exempt Fund." New York Life defined "Exempt Fund" as "an underlying investment account that is excepted from registration under the Investment Company Act of 1940 by Section 3(c)(1) of that Act."

33.    New York Life also assured Plaintiff that "[e]ach Underlying Portfolio has a different investment objective that it tries to achieve by following its own investment strategy."

34.    New York Life also made certain representations in the offering materials about its role in managing the Separate Accounts Subaccounts on behalf of its policyholders. For example, New York Life retained "the exclusive right to select the investments of the Separate Account Subaccounts."

35.     In the NYL Offering Memorandum, New York life set forth its rights to make

changes to the Separate Accounts:

> When permitted by law, and subject to any required notice to You and approval
> by regulatory authorities or You, the Company has the right to make the following
> changes with regard to the Separate Accounts:
>
> • Transfer the assets of any Separate Account to one or more other separate
>   accounts;
>
> • Manage any Separate Account under the direction of a committee;
>
> • Substitute Underlying Portfolios of any Subaccount.
>
> • Make available additional separate accounts;
>
> • Restrict or eliminate any of Your voting rights or other persons who have
>   voting rights as to any Separate Account;
>
> • Restrict transfers among separate accounts;
>
> • Combine any Separate Account with one or more other separate accounts;
>
> • Make additions to, deletions from, or substitutions for the Registered
>   Funds or Exempt Funds held by any Subaccounts;
>
> • Merge existing Subaccounts;
>
> • Close existing Subaccounts to new investments;
>
> • Close existing Subaccounts to new investors;
>
> • Change the investment policy of an Subaccounts;
>
> • Register or de-register any Separate Account under the 1940 Act;
>
> • Change the name of any Separate Account; or
>
> • Change the amount of any minimum or maximum investments or
>   additional investments.

36.     In the Policy, New York Life set forth a similar array of rights by which it

purported to maintain the Separate Accounts:

When permitted by law, and subject to any required notice to You and approval by regulatory authorities or You, the Company has the right to make the following changes with regard to the Separate Accounts:

- Establish new Subaccounts;

- Transfer the assets of a Separate Account to one or more other Separate Accounts;

- Substitute new Subaccounts;

- Combine existing Subaccounts to new investments;

- Eliminate Subaccounts;

- Close existing Subaccounts to new investments;

- Change the investment policy of a Subaccount;

- Restrict or eliminate any of the voting rights of policy owners or other persons who have voting rights as to a Separate Account;

- Register or de-register a Separate Account under the Investment Company Act of 1940;

- Change the name of a Separate Account;

- Change the amount of any minimum/maximum investments;

- Manage a Separate Account under the direction of a committee; and

- Substitute Underlying Portfolios of any Subaccounts.

We will notify You prior to any such change in the Subaccounts.

*        *        *

If any change results in a material change in the Underlying Portfolios of Subaccounts to which the Account Value for this policy are allocated, We will notify You of such change.  You may then make a new election under the Allocation to Subaccounts Provision.

37.    New York Life repeated its promise to notify Plaintiff of "any changes" in his "underlying portfolio" in the NYL Offering Memorandum:

> We will notify You if any change results in a material change in the Underlying Portfolios. . . . You will be given advance notice and the ability to effect a transfer prior to or at the time the material change will become effective.

38.     New York Life also represented to Plaintiff that his investment in the underlying Portfolios offered through Policy would meet certain minimum "Diversification Requirements" required by the Internal Revenue Code.     The Offering Memorandum described these diversification requirements as follows:

> Code Section 817(h) requires a variable life insurance policy to be adequately diversified in order to be treated as life insurance or United States federal income tax purposes. . . .   Under these rules, separate accounts may generally not invest over 55% of their assets in a single investment fund.  Where, however, all of the asset of the investment fund are owned by insurance companies, and access to the fund is available solely through purchases of a variable product, then the IRS will "look through" the fund and treat each separate account as owning a pro rata share of each of the underlying assets of the fund.  Therefore, a separate account that invests in such a fund will satisfy the diversification rules so long as the fund has adequately diversified its investments under the 55/70/80/90 rule described above.

39.     In connection with these diversification requirements, New York Life represented to Plaintiff that "[w]e intend to monitor the performance of each Portfolio to review continuing compliance with diversification . . . requirements."

40.     In the Offering Memorandum, New York Life also reserved the right, among other things, to substitute the investments offered through the Policy "when, at our sole discretion, marketing needs or investment conditions warrant" and to "establish a committee, board, or other group to manage one or more aspects of the operation of the Separate Account":

> We reserve the right, subject to compliance with the law as then in effect, to make additions to, deletions from, or substitutions for the securities that are held in the Separate Account or any Subaccount, or that any Subaccount may purchase.  *If shares of any or all of the Portfolios should no longer be available for investment, or if, in the judgment of our management, further investment in shares of any or all Portfolios of the Funds should become inappropriate in view of the purposes of the Policies, we may substitute shares of another Portfolio or of a different fund for shares already purchased, or to be purchased in the future under the Policies.*

14

We also reserve the right to establish additional Funds which may include additional Underlying Portfolios of the Separate Account to serve as investment options under the Policies which may be managed separate accounts or may invest in a new Portfolio of a Fund, or in shares of another investment company, a portfolio thereof, or suitable investment vehicle with a specified investment objective. New Portfolios may be established when, at our sole discretion, marketing needs or investment conditions warrant, and any new Portfolios will be made available to existing Policy Owners at our discretion and on a basis to be determined by us. *We may also eliminate one or more Portfolios if, in our sole discretion, marketing, tax, or investment conditions so warrant. We may also terminate and liquidate any Portfolio.*

*In the event of any such substitution or change, we may, by appropriate endorsement, make such changes in your Policy and other policies as may be necessary or appropriate to reflect such substitution or change.*

41.    Thus, New York Life promoted the Policy to Plaintiff as a diversified investment. New York Life represented that it would "monitor" Plaintiff's investment for "adequate diversification" in the sense that it would "look through" the Tremont Fund to the diversification of its holdings. Indeed, the litany of rights and duties set forth by New York Life under the Policy were comparable to those of an investment manager with duties to its client. These duties, and the bespoke nature of the Policy, placed New York Life in a special relationship with Plaintiff. Indeed, for its services, New York Life collected substantial fees from Plaintiff, who in turn entrusted millions of dollars to New York Life's management and care. Rather than performing these tasks, however, New York Life assumed the role of a passive, ministerial intermediary that contracted to promote a complex investment about which it knew nothing and without any regard for the truth of its statements. Yet, New York Life failed even in that role by failing to monitor the diversification of Plaintiff's investment and instead handing it to a Ponzi scheme.

42.    On May 12, 2003, in reliance on the above representations, Plaintiff purchased the Policy, with a face value of $6,394,951.00.

**Tremont and New York Life Agreed to Solicit Investments from Insurance Investors Such as Plaintiff Using Agreed-Upon False and Misleading Promotional Materials**

43.     On March 26, 2004, New York Life, Tremont Partners, and the Tremont Fund entered into their Participation Agreement.   Therein, New York Life and Tremont Partners expressly agreed that the Participation Agreement "should not be shown to prospective investors."   Each party acknowledged that the Tremont Fund was "established . . . for the purpose of investing in the [Tremont Fund] premiums or contributions made under certain privately placed variable life insurance contracts or variable annuity contracts that are issued by . . . [New York Life]" and that New York Life "intends to offer" those variable contracts to "investors."

44.     The Participation Agreement contains the following material terms:

a.     New York Life and Tremont expressly agreed that their Participation Agreement "should not be shown to prospective investors."

b.     The Tremont Fund was "established as a private investment fund . . . for the purpose of investing in the [Tremont Fund] premiums or contributions made" under the VUL Policies issued by New York Life;

c.     New York Life would "withdraw amounts invested in [the Tremont Fund] to compensate [New York Life] for the administrative, risk and other expenses associated with" its insureds' investment of VUL Insurance premiums in the Tremont Fund;

d.     Tremont warranted that it would furnish New York Life with copies of the Tremont PPM and any supplements or amendments thereto within ten days of issuance.  New York Life, in turn, promised to provide copies of such documents to its insureds;

e.     Tremont warranted that it would allow New York Life to inspect the accounts and the books of the Tremont Fund;

f.     Tremont and New York Life promised to (i) provide each other with copies of their respective PPMs and other marketing materials; (ii) refrain from distributing any marketing materials to which either party objected; and (iii) refrain from making any representations concerning the Tremont Fund and the New York Life VUL Policies inconsistent with the parties' PPMs and corresponding sales and marketing literature; and

g.    Absent a few narrow exceptions, New York Life would only be permitted to cease promoting Tremont as an available investment to its policyholders upon six months prior written notice to Tremont.

45.    In fact, the Participation Agreement did not even allow New York Life to "cease . . . promoting the [Tremont Fund] as an investment option under the Contracts" unless New York Life gave "written notice" to the Tremont Fund under certain defined circumstances such as, for example, (1) "institution of formal proceedings against the [Tremont Fund];" (2) if the Tremont Fund determined that New York Life is "subject to material adverse publicity that is likely to have a material adverse impact" on the Tremont Fund; or (3) at New York Life's option upon six months notice.

46.    In exchange for promoting the Tremont Fund, Tremont Partners allowed New York Life to "withdraw amounts invested in the Tremont Fund to compensate [New York Life] for the administrative, risk, and other expenses associated with the Variable Contracts, and to provide benefits under the Variable Contracts."

47.    To solicit investors in the Tremont Fund, Tremont Partners and New York Life also agreed upon the specific sales and marketing materials that New York Life, which would be a limited partner of the Tremont Fund, would furnish to investors such as Plaintiff "on behalf of the [Tremont Fund]":

**5.3  Offering Contracts**. . . .   [N]o advertising, sales literature or other promotional material will be employed in the sale of the Contracts, other than a private placement memorandum describing the Contract, statements contained therein, and certain client specific analysis and information.

\*        \*        \*

**5.5 Insurer Representations.**  *[New York Life] shall not give any information or make any representations or statements* on behalf of the [Tremont Fund] in connection with the sale of the Contracts *other than the information or representations contained in the Establishing Documents,* any side letters thereto and this Agreement, as the same may be supplemented or amended from time to

time, or in sales literature or other promotional material approved by the [Tremont Fund] of its designee.

*        *        *

**5.6 [Tremont Fund] Sales Literature.** *The [Tremont Fund] shall furnish, or cause to be furnished, to the [Carriers] each piece of the [Tremont Fund's] sales literature or other promotional material* in which the [Carriers are] named. . . .

48.    Thus, through the Participation Agreement, New York Life and Tremont Partners conspired to purposefully direct false representations to Plaintiff and other variable life insurance investors in order to attract investments in the Tremont Fund, to which they were respectively limited and general partners.

**New York Life Conveyed False Representations to Plaintiff on Behalf of the Tremont Fund Pursuant to its Participation Agreement with Tremont**

49.    In connection with Plaintiff's investment, New York Life, acting on behalf of the Tremont Fund, furnished to Plaintiff the Tremont PPM the LPA.  In furnishing these documents, New York Life conveyed and reiterated to Plaintiff Tremont's false and misleading representations – which the Participation Agreement makes clear were intended for Plaintiff – about Tremont's investment management activities and about the Tremont Fund's investment strategy, including the following:

- "The use of a multi-manager format . . . will afford . . . the opportunity to . . . [i]nvest in a diversified portfolio that is a*ctively managed and monitored by and under [Tremont Partners]*, which has substantial experience in the 'alternative investment' markets [and] [i]nvest in a diversified portfolio with a minimum capital contribution. . . ."

- "[Tremont Partners] will request detailed information on a continuing basis from each Manager regarding the Manager's historical performance and investment strategies."

- "In selecting Managers, the [Tremont Partners] collects, analyzes and evaluates information regarding the personnel, history and background, and the investment styles, strategies and performance of professional investment management firms."

18

- "[Tremont Partners] seeks to select Managers that satisfy one or more criteria including, but not limited to: extensive investment management experience; successful historical performance, including a history of consistent returns with respect to the Manager's investment style; the degree to which a specific Manager complements and balances the Partnership's Portfolio with respect to the strategies employed by other Managers; the quality and stability of the Manager's organization; the ability of the [Tremont Fund] to make withdrawals or liquidate its investment; and the ability of each Manager to consistently and effectively apply its investment approach."

- "The [Tremont Partners], in its capacity as general partner of the [Tremont Fund], has overall responsibility for implementing the investment strategy of the [Tremont Fund] and . . . [i]t is the general policy of the [Tremont Fund] to allocate assets to Managers that exhibit opportunistic styles and strategies.

- "The terms 'opportunity' and 'opportunistic' refer to a broad range of investment strategies including but not limited to: long-short equity strategies, hedging and arbitrage techniques in the equity, fixed income, and currency markets. . . ."

- "The use of a multi-manager format . . . is designed to provide investors with a diversified investment portfolio . . . ."

- "The [Tremont Fund] is engaged in a diversified investment strategy. . . ."

- "The underlying investment securities in which the [Tremont Fund] invests through the Managers are principally purchased and sold through brokerage firms in the United States . . . [Tremont Partners] will attempt to select Managers that it believes will use their best efforts to obtain execution of Portfolio transactions at prices which are advantageous to the [Tremont Fund] and at commission rates which are reasonable. . . ."

**Tremont Misrepresented the Tremont Fund and its Management of the Tremont Fund**

50.     As noted in paragraphs 4 and 50 above, Tremont, and particularly Tremont Partners as the Tremont Fund's General Partner, made numerous false and misleading statements to Plaintiff regarding the Tremont Fund and Tremont Partners' management of the Tremont Fund.

***Tremont Made False and Misleading Statements about the Tremont Fund's
Investment Objectives and Strategies***

51.     Tremont Partners falsely represented the Tremont Fund's investment objectives
and how those stated investment objectives were to be achieved.  Tremont Partners represented
that it was the "general policy of the [Tremont Fund] to allocate assets to Managers that exhibit
opportunistic styles and strategies," which Tremont defined as "including but not limited to:
'long-short equity strategies, hedging and arbitrage techniques in the equity, fixed income, and
currency markets; index arbitrage; interest rate arbitrage; convertible bond and warrant hedging;
merger arbitrage; statistical long/short equity strategies; pairs trading; and investment in non-
U.S. securities.'"

52.     Tremont's statements were false and misleading because the Tremont Fund's
investment objectives could not be achieved using Tremont's stated strategy.  Indeed, investment
professionals with much less of a connection to Madoff than Tremont were unable to replicate
the split strike strategy and the returns purportedly achieved by Madoff using that strategy.

53.     Moreover, Tremont's statement that it used an investment strategy with multiple
managers so as to provide investors with a "diversified investment portfolio" was patently false
because the Tremont Fund secretly invested over 22% of the fund's assets – an extremely
concentrated position – with Madoff.  By abandoning its "non-correlated investment" strategy
and placing direct responsibility and discretion in Madoff, Tremont exposed Plaintiff to
investment risks not consistent with the diversified investment strategy that Tremont Partners
and the Tremont Fund described in the Tremont PPM.

***Tremont Made False and Misleading Statements about its Due Diligence and Ongoing Monitoring of Investment Managers***

54.    Tremont claimed that it conducted "on-site interviews and examination of [its investment managers' organizations] to evaluate back office operations and internal staff, among other things."

55.    Tremont Partners, as the General Partner of the Tremont Fund, represented that it would "actively manage[] and monitor[]" the Tremont Fund's portfolio, and that it could do that because it had "substantial experience in the 'alternative investment' Markets."    Tremont Partners further represented that "[i]n selecting Managers, [Tremont Partners] collects, analyzes and evaluates information regarding the personnel, history and background, and the investment styles, strategies and performance of professional investment management firms."    Tremont Partners further represented that it "relied on underlying investment advisor reports and its examination of advisor operations as primary sources of information."    Tremont further claimed that the "Partnership makes investments based on actual historical performance."

56.    Tremont Partners also claimed that it "maintains a database of over 6,000 management firms to evaluate investment process, approach and investment results."    Tremont Partners stated that they were "engaged on a daily basis with custodians and/or trustees to monitor cash flow and fund compliance.    Fund accounts are monitored in terms of securities holdings, asset mix and adherence to investment guidelines.    [Tremont Partners] uses its own proprietary software programs to monitor the performance of investment managers.    Senior officers are responsible for the reporting and monitoring functions."

57.    Tremont Partners also claimed that "[t]he use of a multi-manager format . . . will afford Limited Partners the opportunity to:    Invest in a diversified portfolio that is actively

managed and monitored by and under [Tremont Partners], which has substantial experience in the 'alternative investment' markets. . . ."

58.    However, if the Tremont Partners had performed anything like the extensive pre-retention review or post-retention management and monitoring they represented to perform – including "examination of advisor operations as primary sources of information" – this lawsuit would have been unnecessary.  Because Tremont Partners did not do so, Tremont Partners' representations were false.

59.    Defendant Tremont's Form ADV further stated that Tremont "utilized databases, wire services, performance measurement publications and other surveys of investment results, such as newspapers, and other business journals as information sources. . . . [and had] a license to utilize the information included in the Lipper TASS database, an extensive database of hedge fund investment manager performance."

60.    Tremont's representations above were false.   First, Tremont misrepresented and/or abandoned the Tremont Fund's "non-correlated investment" strategy.   Second, despite assurances that Tremont would carefully select – ***through "on-site interviews" and evaluation of "back office operations"*** - an investment professional to whom the Tremont Fund's investment authority was delegated, Tremont failed to use these selection methods or criteria outlined in the Tremont Fund's offering materials.   Third, despite pledging to conduct thorough due diligence of any investment advisor and/or investment products before making investment decisions, Tremont failed to perform any due diligence prior to investing the Tremont Fund's assets with Madoff and/or BMIS.   Fourth, despite claims that Defendant Tremont would consistently monitor the status of the Tremont Fund's investments, it failed to conduct any such monitoring activities with respect to the Tremont Fund's assets that were invested with Madoff.

**Plaintiff Relied on New York Life and Tremont's Statements to Invest in the Tremont Fund**

61.    In May 2004, in reliance on the Tremont PPM and other materials from New York Life and Tremont Partners, Plaintiff made an initial investment in the Tremont Fund of $426,106.82.  Plaintiff continued to invest in the Tremont Fund, and by October 2008, Plaintiff's account statement indicated a balance of $1,138,697.62 in the Tremont Fund.  However, Plaintiff did not know – and had no way to detect – that Tremont had allocated 22% of the Tremont Fund to Madoff and BMIS.

**New York Life Issued Periodic Statements that Completely Misrepresented the Value of Plaintiff's Investment in the Tremont Fund**

62.    From May 2004 until December 2008, New York Life issued periodic statements that misrepresented the value of Plaintiff's investment in the Tremont Fund.  The value of Plaintiff's investment was consistently overstated because approximately 22% of Plaintiff's investment had actually been funneled to Madoff's Ponzi scheme.

**Defendants Ignored the Warning Signs Concerning Madoff and BMIS**

63.    Defendants were content to collect their respective fees and, rather than jeopardize this income stream, they failed to perform the necessary due diligence required to meet their fiduciary obligations due Plaintiff.  Likewise, to the extent that New York Life and Tremont did perform due diligence, they violated their fiduciary duties by purposefully failing to communicate material information to their investors.

64.    According to *Bloomberg News*, Tremont "sold Madoff-managed investments since 1997 under the Rye Select Broad Market name, charging 2 percent of assets."

65.    Yet, Tremont, in breach of its fiduciary duties, failed to conduct even the most rudimentary due diligence on Madoff (instead relying on Madoff's "reputation").  Tremont failed to conduct any investigation of the *bona fides* of Madoff and his operation, and/or an analysis of

the trading strategies and investment returns reported by Madoff, which remained suspiciously and consistently high even during adverse market conditions.

66.    Defendant Tremont, as the manager and general partner of the Tremont Fund and the Rye Funds, utterly failed to supervise, monitor, and manage the investments of those funds. By way of its failures and omissions, Tremont violated its duties under the laws of the State of New York.

67.    Defendant Tremont acted with knowledge that it abdicated responsibility for the management of the Tremont Fund's and the Rye Funds' assets to Madoff, and with gross negligence in failing to perform or causing to be performed appropriate due diligence that would have revealed material irregularities in the investments, operations, and financial reporting of Madoff.

68.    Tremont either knew or negligently disregarded:  (a) the concentration of the Tremont Fund's investments in a single third-party investment manager, Madoff; (b) the materially heightened risk to the Tremont Fund's assets from such reliance on Madoff, particularly given the lack of transparency of Madoff's operations; (c) the abnormally high and stable positive investment results reportedly obtained by Madoff; (d) the inconsistency between BMIS's publicly available financial information concerning its assets and the purported amounts that Madoff managed for clients such as Tremont; and (f) the fact that BMIS itself was audited by a small, obscure accounting firm, Friehling & Horowitz, which has its offices in Rockland County, New York and had no experience auditing entities of the apparent size and complexity of BMIS.

69.    Unlike Tremont, other investment managers and advisors who conducted due diligence on Madoff and ran even the most simplistic models testing the validity of Madoff's

results, recognized the fraudulent irregularities with Madoff's investments.  For example, the financial press reported that Robert Rosenkranz of Acorn Partners, an investment advisor for high net individuals, conducted due diligence on Madoff and found it very likely that the BMIS account statements were generated as part of a fraudulent scheme.  Mr. Rosenkranz reached this conclusion based on, *inter alia*, the abnormally stable and high investment returns claimed by Madoff, as well as the inconsistencies between customer account statements and the audited BMIS financial statements filed with the SEC.

70.    The financial press also reported that, prior to the disclosure of the massive fraud caused by Madoff, Simon Fludgate, head of operational due diligence at Aksia, another advisory firm, concluded that the stock holdings reported in the quarterly statements of BMIS filed with the SEC appeared too small to support the size of the assets Madoff claimed to be managing. The likely reason for this was revealed on December 15, 2008, when investigators working at Madoff's offices determined that Madoff was operating a secret, unregistered investment vehicle from his office.

71.    Further, *BusinessWeek* reported that "managers of the Fort Worth pension fund, who first invested with Rye five years ago, started to rethink their investment in early 2008 after hiring Albourne Partners, a London due diligence firm, to assess their hedge fund portfolio.  The Rye Fund raised red flags almost immediately.  Albourne's managing director, Simon Ruddick, says the firm, which had long-standing concerns about Madoff's trading strategy and consistent returns, had urged clients for nearly a decade to avoid affiliated funds such as Rye.  In July, the pension's board voted unanimously to dump its Rye stake."

72.    Indeed, there were warning signs going back as early as 1992 that should have alerted investment professionals, such as New York Life and Tremont, that Madoff and/or BMIS were perpetrating a massive fraud on investors.

73.    For example, in 1992, the SEC filed a lawsuit against accountants Frank Avellino and Michael Bienes, who sold $441 million in unregistered securities to 3,200 people, promising returns of 13.5 to 20 percent, and invested the money entirely with Madoff.  As a result of the SEC investigation, Avellino and Bienes agreed to shut down their business and reimbursed their clients.  No action was taken against Madoff.

74.    In May 1999, Harry Markopolos, a derivative expert with experience managing the "split-strike conversion" strategy used by Madoff, sent a letter to the SEC describing how Madoff could not have generated the returns he reported using that strategy.

75.    A May 2001 article entitled "Madoff Tops Charts; Skeptics Ask How" in *MAR/Hedge*, a semi-monthly newsletter reporting on the hedge fund industry, reported that Madoff had reported positive returns for the last eleven-plus years for Fairfield Sentry and other feeder funds, but that current and former traders, other money managers, consultants, quantitative analysts, and fund-of-funds executives, many of whom were familiar with the so-called split-strike conversion strategy used by Madoff, questioned the consistency of the returns. These professionals noted that others using the strategy had nowhere near the same degree of success, and that Gateway, a publicly traded mutual fund, which also used the strategy purported employed by Madoff, had experienced far greater volatility and lower returns than Madoff.

76.    Further, the article reported that Madoff's strategy and trading were done by signals from a proprietary "black box," and that Madoff would not disclose the specifics of his firm's risk management and how it could move so much capital in and out of positions without

having a major effect on the market.  The article quoted Madoff as saying "I'm not interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk."

77.    On May 27, 2001, *Barron's* published an article entitled "Don't Ask, Don't Tell; Bernie Madoff is so secretive, he even asks his investors to keep mum."   As reported in *Barron's*, Madoff's accounts

> [H]ave produced compound average annual returns of 15% for more than a decade. Remarkably, some of the larger, billion-dollar Madoff-run funds have never had a down year.  When *Barron's* asked Madoff how he accomplishes this, he says, 'It's a proprietary strategy. I can't go into it in great detail.'  Nor were the firms that market Madoff's fund forthcoming.

78.    The article reported that some on Wall Street, including three options strategists for major investment banks, were skeptical regarding how Madoff achieved his double-digit returns using options alone, and told *Barron's* they couldn't understand how "Madoff churns out such numbers using this strategy."

79.    The article further reported that:

> The lessons of Long-Term Capital Management's collapse are that investors need, or should want, transparency in their money manager's investment strategy. But Madoff's investors rave about his performance – even though they don't understand how he does it.  "Even knowledgeable people can't really tell you what he's doing," one very satisfied investor told *Barron's*.  People who have all the trade confirms and statement still can't define it very well; . . .  This investor declined to be quoted by name.  Why?  Because Madoff politely requests that his investors not reveal that he runs their money.
>
> *        *        *
>
> What Madoff told us was, 'If you invest with me, you must never tell anyone that you're invested with me.  It's no one's business what goes on here,' says an investment manager who took over a pool of assets that included an investment in a Madoff fund.  'When he couldn't explain to my satisfaction how they were up or down in a particular month,' he added, 'I pulled the money out.'

80.    The *Barron's* article quoted a former Madoff investor as stating: "Anybody who's a seasoned hedge-fund investor knows the split-strike conversion is not the whole story.  To take it at face value is a bit naïve."

81.    The *Barron's* article effectively posited that Madoff may have been "front running," the illegal practice of a stock broker executing orders on a security for its own account while taking advantage of advance knowledge of pending orders from its customers.    The *Barron's* article described Madoff's potential front-running operation:

> "Those returns have been so consistent that some on the Street have begun speculating that Madoff's market-making operation subsidizes and smoothes his hedge-fund returns.  Why would Madoff Securities do this?  Because, in having access to such a huge capital base, it can make much larger bets – with very little risk – than it could otherwise.  It works like this: Madoff Securities stands in the middle of a tremendous river of orders, which means that its traders have advance knowledge, if only by a few seconds, of what the big customers in the market are buying and selling.  And by hopping on the bandwagon, the market maker effectively locks in profits.  As such, throwing a little cash back to the hedge funds would be no big deal.  And the funds' consistent returns, in turn, attract more capital."

82.    Moreover, Madoff, instead of using an outside prime broker as nearly all hedge funds do, was his own prime broker and custodian of all the assets he manages.  A December 13, 2008 article in *The Wall Street Journal* quoted Chris Addy, founder of Castle Hall Alternatives, which invests in hedge funds for clients, as follows:  "There was no independent custodian involved who could prove the existence of assets. . . .  There's clear and blatant conflict of interest with a manager using a related-party broker-dealer.  Madoff is enormously unusual in that this is not a structure I've seen."

83.    On November 7, 2005, Harry Markopolos submitted another letter to the SEC, titled "The World's Largest Hedge Fund is a Fraud," in which he set forth in detail, over 17 single-spaced pages and a two-page attachment, how Madoff's returns could not be real.

Markopolos identified 29 red flags that were signs of highly suspicious activity at Madoff

Securities, including:

    a.    *"Madoff does not allow outside performance audits."*

    b.    *"[W]hy would B[ernard] M[adoff] settle for charging only undisclosed commissions when he could earn standard hedge fund fees of 1% management fee + 20% of the profits?"*

    c.    "The third party hedge funds and fund of funds that market this hedge fund strategy that invests in BM don't name and aren't allowed to name Bernie Madoff as the actual manager in their performance summaries or marketing literature. . . . ***Why the need for such secrecy?*** *If I was the world's largest hedge fund and had great returns, I'd want all the publicity I could garner and would want to appear as the world's largest hedge fund in all the industry rankings*."

    d.    *"It is mathematically impossible for a strategy using index call options and index put options to have such a low correlation to the market where its returns are supposedly being generated from. This makes no sense! . . . However, BM's performance numbers show only 7 extremely small* [monthly] *losses during 14 ½ years and these numbers are too good to be true. The largest one month loss was only -55 basis points (-0.55%) or just over one-half of one percent! And BM never had more than a one month losing streak!"*

    e.    *"Madoff's returns are not consistent with the one publicly traded option income fund with a history as long as Madoff's."*

    f.    *"Why is Bernie Madoff borrowing money at an average rate of 16.00% per anum and allowing these third party hedge fund, fund of funds to pocket their 1% and 20% fees bases* [sic] *upon Bernie Madoff's hard work and brains? Does this made any sense at all? Typically FOF's* [fund of funds] *charge only 1% and 10%, yet BM allows them the extra 10%. Why? And why do these third parties fail to mention Bernie Madoff in their marketing literature? After all he's the manager, don't investors have a right to know who's managing their money?"*

    g.    *"BM goes to 100% cash for every December 31*<sup>st</sup> *year-end according to one FOF invested with BM. This allows for 'cleaner financial statements' according to this source. Any unusual transfers or activity near a quarter-end or year-end is a red flag for fraud."*

    84.    According to a January 28, 2009 article in the New York Times, JPMorgan Chase

became concerned about its investments in BMIS in the fall of 2008 when its "due-diligence

people had too many doubts." Consequently, in October 2008, JPMorgan Chase "suddenly cashed out" of the Madoff-invested Fairfield funds.

**Tremont Group's Financial Advisor Conducted Extensive Due Diligence on Madoff in Connection with the 2001 Sale of Tremont and Reported Its Findings in An "Information Package"**

85.    In or about 2000, Massachusetts Mutual Life Insurance Co. ("MassMutual") determined to accelerate its involvement in what was then the extraordinarily lucrative hedge fund arena.

86.    In search of strategic acquisitions to help it achieve this objective, MassMutual set its sights on Tremont Advisers, Tremont Group's predecessor entity. MassMutual designated its subsidiary, Oppenheimer Acquisition Corporation ("Oppenheimer), to pursue a deal with Tremont Advisers.

87.    In March 2001, Oppenheimer approached Tremont Advisers' financial advisor, Putnam Lovell Securities, Inc. ("Putnam Lovell"), and expressed "an interest in exploring a strategic transaction with Tremont," according to Tremont Advisers' Form DEFM14A filed with the SEC on August 20, 2001 (the "Tremont Proxy").

88.    Tremont Advisers' access to Madoff was one of its greatest selling points. According to Tremont Advisors' Form 10-K SB filed with the SEC, just as Oppenheimer was making its initial approach in March 2001, Tremont Advisers stated that the Market Fund, Prime Fund and its other proprietary investment funds were designed "to provide clients with vehicles for investments with 'hard-to-access' managers." Madoff was the most prominent of these "hard-to-access" managers.

89.    After Oppenheimer and Tremont Advisers entered into a confidentiality agreement on or about March 14, 2001, Oppenheimer was provided with an "information package" that Putnam Lovell had prepared. The package included, among other things, "a

description of Tremont's various business lines, an overview of its investments and distribution platform, its strategic relationships, its distribution need and its financial projections," according to the Tremont Proxy.

90.    Significantly, included in this package was Putnam Lovell's "***analysis of the significant contribution to Tremont's revenues from a single relationship it has with an investment manager to its proprietary investment products[,]***" according to the Tremont Proxy. This "single relationship" was Tremont Advisers' critical relationship with Madoff.

91.    Thus, at the very outset of the transaction, the issue of Tremont Advisers' close and highly lucrative relationship with Madoff was placed squarely before Oppenheimer and its affiliated entities in the MassMutual Financial Group.

92.    On or about April 27, 2001, Oppenheimer submitted to Tremont Advisers a written "preliminary indication of interest" signaling that it valued Tremont Advisers at between $100 million and $140 million.

93.    Over the second half of May 2001, Oppenheimer held extensive meetings with Tremont Advisers to discuss "various business function areas, such as sales and marketing, accounting and administration and manager research," according to the Tremont Proxy.

94.    Also during the second half of May 2001, Oppenheimer representatives conducted extensive due diligence in Tremont Advisers' data room, according to the Tremont Proxy.

95.    On or about May 21, 2011, Putnam Lovell and Tremont Advisers' counsel at Skadden, Arps forwarded a draft merger agreement to Oppenheimer along with a "protocol letter" inviting Oppenheimer to submit a final proposal to acquire Tremont Advisers.

96.    From late May into early June 2001, the senior management of Tremont Advisers along with representatives of Putnam Lovell continued to work closely with senior Oppenheimer executive who were continuing their due diligence – a painstaking, deliberate process then entering its third month.

97.    The due diligence conducted by Oppenheimer focused in substantial part on Tremont Advisers' business dealings with Madoff and BMIS, as well as Madoff's investment strategy and the overall nature of BMIS's operations.

98.    By mid-June 2001, Oppenheimer had completed its due diligence, according to the Tremont Proxy.

99.    As a consequence of their due diligence and through other available sources, as early as the spring of 2001, MassMutual, MassMutual Holding, Oppenheimer, and other members of the MassMutual Financial Group were aware of (or recklessly disregarded) numerous "red flags" or indicators of gross irregularities in Madoff's operations.

100.    In addition to this due diligence, at the time Oppenheimer was pursing the purchase of Tremont Advisers, sophisticated players within the investment community who were not involved in the Tremont Advisers transaction already had begun to publicly express skepticism regarding the legitimacy of Madoff's operations.

101.    For example, in May 2001 – at the height of Oppenheimer's due diligence inquiry – the aforementioned *MAR/Hedge* article entitled "Madoff Tops Charts; Skeptics Ask How" was published.  (*See* ¶ 85, *supra*.)

102.    Noting the consistently positive returns Madoff claimed to have earned for his investors over the years, the *MAR/Hedge* article reported that numerous traders, money managers and fund managers employing a split-strike conversion strategy experienced far greater volatility

and more meager returns than Madoff was reporting with respect to what he claimed was his split-strike conversion strategy. In other words, the article highlighted the fact that Madoff's track record could not be replicated by others employing the same investment strategy he claimed to be utilizing.

103.    In addition, on or about May 27, 2001 – again, at the height of Oppenheimer's due diligence inquiry – the aforementioned article entitled "Don't Ask, Don't Tell: Bernie Madoff Is So Secretive, He Even Asks His Investors to Keep Mum" was published. (*See* ¶ 87, *supra*.)  This article reported that three derivative strategists at major investment banks were highly skeptical about the usually steady double-digit returns Madoff claimed were flowing from his split-strike conversion strategy.

104.    Additionally, a *Barron's* article quoted a former Madoff investor as stating:  "Anybody who's a seasoned hedge-fund investor knows the split-strike conversion is not the whole story.  To take it at face value is a bit naïve."

105.    Notwithstanding their knowledge of Tremont Advisers' close relationship with Madoff, the nature of Madoff's operations and the skepticism that other sophisticated entities were expressing publicly with respect to Madoff's alleged investment strategy, executives at the highest level of MassMutual, Oppenheimer, and other MassMutual Financial Group entities pressed forward with the Tremont Advisers acquisition.

106.    On or about June 8, 2011, Oppenheimer submitted a formal proposal to acquire all of Tremont Advisers' outstanding common stock for $18.25 per share, according to the Tremont Proxy.

107.    Neither its own due diligence into Madoff's operations nor the increasing skepticism being voices about his purported investment strategy dampened Oppenheimer's drive to acquire Tremont Advisers.

108.    Indeed, on or about June 25, 2001, Oppenheimer enhanced its initial proposal and offered to acquire Tremont Advisers at $19.00 per share, according to the Tremont Proxy.

109.    On June 27, 2001, Tremont Advisers' board of directors authorized senior management to conclude their negotiations with Oppenheimer.

110.    On July 9, 2001, Tremont Advisers' board unanimously approved the proposed transaction and the final terms of the deal were finalized early the next day.

111.    At the time of the acquisition of Tremont Advisers by MassMutual Financial Group, Tremont Advisers' board consisted of five members. All five board members had direct ties to a MassMutual and/or an Oppenheimer entity. Accordingly, the due diligence on Tremont's relationship with Madoff, which was conducted by Putnam Lovell at the request of MassMutual and/or an Oppenheimer, was available to each of Tremont Advisors' board members.

**Defendants Reveal their Negligence to Plaintiff and Other Investors**

112.    In a letter dated December 18, 2008, New York Life informed Plaintiff that it had channeled Plaintiff's investment to Madoff's Ponzi scheme:

> New York Life Insurance and Annuity Corporation's Magnastar Private Placement Variable Universal Life Policy ("Magnastar") offers the Tremont Opportunity Fund III, L.P. and the Tremont International Fund, L.P. (the "Tremont Funds") as investment options. We have confirmed that the Tremont Opportunity Fund III, L.P. through its fund-of-funds structure, has investment exposure to Madoff Investment Securities LLC.

113.    In a letter dated December 23, 2008, New York Life informed Plaintiff that 22% of his investment in the Tremont Fund had investment exposure to Madoff's scheme:

From preliminary discussions with Tremont Capital Management ("Tremont"), we understand that there is exposure to Madoff in the Tremont Opportunity Fund III through investments in 3 funds: Rye Select Broad Market Insurance Fund LP; Rye Select Broad Market Prime Fund LP; and Rye Select Broad Market XL Fund LP. It appears that all three of these funds invested substantially all of their assets with Madoff, and that, according to Tremont, as of 10/31/08, the allocation to these three funds represented roughly 22% of the Tremont Opportunity Fund III assets. In addition to this exposure, it is possible that there is further exposure to Madoff through other multi-strategy fund investments, but we have no knowledge of any additional exposure at this time.

**Loss Causation**

114.    Defendants' conduct, as alleged herein, proximately caused losses to Plaintiff as set forth below.

115.    First, Plaintiff has lost the approximately 22% portion of his principal investment in the Tremont Fund that was invested with Madoff.

116.    Second, in or around September 2012, New York Life further adjusted Plaintiff's subaccount, writing down approximately $126,900, reflecting further losses to the Tremont Fund associated with Tremont's settlement with Irving Picard, the court-appointed trustee under the SIPA in the liquidation of BMIS.

117.    Third, Plaintiff has suffered tax consequences as a result of his losses.

118.    Fourth, Plaintiff has lost his share of the millions of dollars in management and advisory fees and administrative service fees that were paid to Defendants New York Life and Tremont. Despite collecting those enormous fees, Defendant Tremont completely failed to provide those services, or provided them so inadequately as to render them completely ineffective.

119.    Fifth, Plaintiff has lost the opportunity to make a different investment and to earn real returns on his investments.

## COUNT I

### Negligent Misrepresentation
### (against New York Life and Tremont)

120.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

121.    New York Life and Tremont respectively owed to Plaintiff duties:  (a) to act with reasonable care in preparing and disseminating the Policy, NYL Offering Memorandum, and other representations relied upon by Plaintiff in deciding to acquire and maintain the Policy; (b) to act with reasonable care in preparing and disseminating the Tremont PPM, LPA, Form ADV, and other Establishing Documents relied upon by Plaintiff in deciding to invest in the Tremont Fund; and (c) to use reasonable care and diligence in determining the accuracy of and preparing the representations and information contained in those materials.

122.    New York Life and Tremont knew that their representations would be provided to policyholders and would be relied upon by them in making investment decisions concerning the Investment Account component of their VUL policies.   Plaintiff reasonably relied on Defendants' representations in making his investments

123.    New York Life and Tremont, by their actions and inactions, knowingly, recklessly, and/or negligently issued, caused to be issued, or participated in the preparation and issuance of deceptive and materially false and misleading statements to Plaintiff regarding the nature and value of his Policy and the nature and value of his interest in the Tremont Fund.

124.    New York Life and Tremont breached their duties to Plaintiff by failing to investigate, confirm, prepare, and review with reasonable care the information contained in these statements and other representations.

36

125.     Neither the statements nor any other material disseminated to Plaintiff ever disclosed the risks associated with the Tremont Fund's investment with Madoff, BMIS or other Madoff controlled entities.  Specifically, and without limitation, the offering materials did not disclose that none of the Defendants had or could ever verify with certainty that Madoff was investing Plaintiff's funds entrusted to him in legitimate securities at all, let along securities consistent with the Policy's and Tremont Fund's stated investment objectives.

126.     As a direct, foreseeable, and proximate result of Defendants' wrongful actions and inactions, Plaintiff has sustained damages, has suffered mental and emotional distress, has lost a substantial part of his investment in an amount yet to be determined, and to be proven at trial.

127.     By reason of the foregoing, Defendants are jointly and severally liable to Plaintiff and he is entitled to punitive damages, in an amount also to be determined at trial, attributable to their wanton course of conduct that was reckless, willful, and without regard to Plaintiff's rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Awarding compensatory damages in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.     Awarding prejudgment interest;

C.     Awarding extraordinary, equitable and/or injunctive relief as permitted by law (including but not limited to disgorgement);

D.     Awarding punitive damages against Defendants in an amount to be proven at trial;

        E.        Awarding Plaintiff his reasonable costs and expenses incurred in this suit, including reasonable attorneys' fees, accountants' fees, and experts' fees; and

        F.        Awarding such other and further relief as the Court may deem just and proper.

### **JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: October 12, 2012                Respectfully submitted,

                        */s/ William S. Norton*
                        William S. Norton (WN-4551)
                        MOTELY RICE LLC
                        28 Bridgeside Boulevard
                        Mt. Pleasant, SC  29464
                        Telephone:    843.216.9000
                        Facsimile:    843.216.9450

                        William H. Narwold (WN-1713)
                        MOTLEY RICE LLC
                        One Corporate Center
                        20 Church Street, 17th Floor
                        Hartford, CT  06103
                        Telephone:    860.882.1676
                        Facsimile:    860.882.1682

                        *Attorneys for Plaintiff F. Daniel Prickett*